141 N.J. Super. 481 (1976)
358 A.2d 828
JULIETTE RYBECK, INDIVIDUALLY AND AS GUARDIAN AD LITEM OF "JOHN RYBECK" (SAID FIRST NAME BEING FICTITIOUS, AN UNBORN INFANT), PLAINTIFF,
v.
RICHARD R. RYBECK AND JONATHAN R. EVANS, DEFENDANTS, AND RICHARD R. RYBECK AND JULIETTE RYBECK, PLAINTIFFS,
v.
AMICA MUTUAL INSURANCE CO., DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided April 30, 1976.
*485 Mr. Gerald M. Zashin for plaintiffs (Gerald M. Zashin, attorney).
Mr. James Martin for defendant Amica Mutual Insurance Co. (Messrs. Lynch, Mannion, Lutz & Lewandowski, attorneys).
Mr. Jack Frost for defendant Evans (Messrs. Hansen, Pantages, Sellar & Zavesky, attorneys).
COHEN, J.C.C.
In this motion for summary judgment, plaintiffs Rybeck seek an order declaring the New Jersey Automobile Reparations Reform Act (hereinafter No Fault Act) to be unconstitutional as a whole and in several specific parts.
There are two consolidated actions. The first arose out of an auto accident involving the Rybeck car and a car *486 driven by Evans. In that suit plaintiff Mrs. Rybeck, a passenger in the family car, sought recovery for her injuries against the two drivers, her husband and Evans. Mrs. Rybeck found herself in an unhappy position vis-a-vis her auto insurance carrier, Amica Mutual Insurance Company. She and her husband were both named insureds on their policy, and consequently she had to look to Amica both for first-party no-fault benefits and also for third-party recovery, alleging negligence on her husband's part.
The second suit is by both Rybecks against Amica, seeking a judgment declaring the No Fault Act underlying their auto policy invalid. The two suits were consolidated. A motion was subsequently made by Amica to disqualify Mrs. Rybeck's attorney in the negligence action from representing both Mr. and Mrs. Rybeck in the consolidated declaratory judgment action. Mr. and Mrs. Rybeck submitted affidavits disclaiming and waiving any conflict of interest, an issue they said they had explored thoroughly with the attorney. Amica then withdrew its motion. It is not known whether Amica did so on the strength of the Rybecks' statement or in the light of the obvious parallel between the attorney's dual representation and Amica's own role as both first-party insuror and liability insuror for the Rybecks, a dual role with which no one seems to be very comfortable. However, there is nothing before me on that question and I choose not to raise it myself. Mr. Rybeck seems to be a totally unnecessary plaintiff in the declaratory judgment action. He represents no interest independent of that of his wife.
Plaintiffs make a number of attacks on the constitutional validity of the No Fault Act. Defendants question their standing to mount many of the attacks and support the validity of the law. Wondering whether the interests of the State were fully represented, I invited the Attorney General to participate. He declined to do so.
In broad outline, plaintiffs' position is that the law is unconstitutional in that it denies to Mrs. Rybeck

*487 (a) access to the courts and trial by jury on all issues formerly so triable in negligence cases;
(b) the right to prove all of her damages by unlawfully enacting a rule of evidence in violation of both the Supreme Court's rule-making power and the doctrine of separation of powers;
(c) the equal protection of the laws by forcing her to deal with Amica both as her no-fault personal injury protection carrier and as the carrier interested in defending against her negligence action;
(d) the equal protection of the laws as a married woman because she is deprived of the option either to obtain her own insurance or to remain uncovered directly by any insurance for no-fault benefits;
(e) the equal protection of the laws by establishing constitutionally impermissible classifications of various sorts, and
(f) due process of the law.
The law with which we deal is officially called the New Jersey Automobile Reparations Reform Act. As the title signifies, it was enacted in response to the widely felt need for reform of our system of awarding damages for injuries arising out of auto accidents. The act establishes a comprehensive scheme for reform of the system for compensating persons injured in auto accidents. It outlaws civil suits for such injuries below a statutory standard of minimal significance. It requires most New Jersey vehicles to be insured by policies providing personal injury protection (PIP) benefits. The purpose of PIP benefits is to compensate injured persons for their out-of-pocket losses, with certain limitations, without regard to fault. The act bars recovery in civil negligence suits of losses covered by PIP benefits.
The act is codified in chapter 6A of Title 39. Section 3 (N.J.S.A. 39:6A-3) requires automobiles, as defined in § 2(a), which are registered or principally garaged in New Jersey, to carry liability insurance with specified minimum *488 limits. Section 4 requires every liability insurance policy required by § 3 to include personal injury protection (PIP) coverage for payment, regardless of fault, to injured insureds and resident family members who are hurt in any auto accident, and, additionally, to injured occupants of the covered auto and passengers injured by it. There are five classes of required PIP benefits: (1) medical expense benefits without limitation, (2) income continuation benefits of up to $100 a week with a maximum of $5,200 a person; (3) substitute essential services benefits of up to $12 a day, with a maximum of $4,380 a person; (4) survivor's benefits of rather limited scope, and finally, (5) funeral benefits with a maximum of $1,000.
Section 10 permits but does not require an insured to purchase PIP coverage in higher amounts than mandated by § 4. Section 5 requires prompt payments of PIP benefits and § 6 provides for deduction from those payments of benefits collectible as workmen's compensation, temporary disability payments and Medicare. Section 12 provides that evidence of amounts paid or collectible under PIP "is inadmissible in a civil action for recovery of damages for bodily injury".
Section 8 bars suit for bodily injury against owners and operators of vehicles with PIP benefits coverage unless the injury either is permanent as opposed to "soft-tissue," or requires treatment with a cost or equivalent value of $200.
Administrative sections of the act authorize early and rather complete medical investigation by PIP carriers when claims are made, require uninsured motorist coverage, and establish penalties for failing to maintain insurance coverage and making fraudulent claims. Section 18 requires a reduction of "bodily injury insurance rates" of "at least 15%" on the effective date of the act.
The act arose out of the nationwide recognition that developed in the 1960s that the traditional court-oriented "fault" system was not working very well to provide prompt compensation for accident victims and fairly allocate the *489 cost. As early as 1932 a workmen's compensation-type of reparations system was seriously entertained as an alternative to the fault system. Columbia University Council for Research in the Social Sciences, Report by the Committee to Study Compensation for Automobile Accidents (1932). The problem and suggestions for reform received frequent attention over the years. See, e.g., Ehrensweig, "Full Aid" Insurance for the Traffic Victim (1954); Rosenberg and Sovern, "Delay and the Dynamics of Personal Injury Litigation", 59 Columbia L. Rev. 1115 (1959); Keeton and O'Connell, Basic Protection for the Traffic Victim (1965). No-fault reparations eventually became the focus of academic and then governmental reform efforts.
In a 1970 joint resolution the New Jersey Legislature created the Automobile Insurance Study Commission and charged it to inquire into the whole area of insurance costs, legal fees, property damage costs, no-fault (as it was already popularly known), arbitration and comparative negligence. The resolution recited the need to reform existing systems and their resulting hardships, high costs and inequities. The Commission submitted its December 1971 report, "Reparation Reform for New Jersey Motorists."
Among the problems to which the Commission invited legislative attention were (1) the inability of persons whose negligence contributed to their injuries to obtain compensation; (2) the high and still rising costs of auto insurance; (3) the uncertain availability of insurance coverage and (4) the inefficiency of the judicial process to handle the volume of automobile cases with reasonable economy and promptness. The whole range of problems is thoroughly explored in the New York Court of Appeals opinion in Montgomery v. Daniels, 38 N.Y.2d 41, 378 N.Y.S.2d 1, 340 N.E.2d 444 (Ct. App. 1975).
The Commission recognized that solving all these problems required inconsistent and competing measures. If no-fault was to compensate those previously barred by their own negligence, then insurance costs would have to rise to *490 meet the newly cognizable claims. On the other hand, if costs and therefore premiums were to be lowered, the average claim cost would have to be drastically reduced. "Reparation Reform for New Jersey Motorists," at 121-22. Many more people sharing less money would require each of them to receive a substantially smaller amount. This simple truth somehow escaped those who later argued, Januslike, that no-fault would deliver greater dollar benefits to the community while exacting smaller premiums.
A number of bills containing different reform proposals were introduced for legislative consideration in early 1972. Assembly Bill 666 required arbitration of all auto claims of less than $5,000. Senate Bill 517 was much like the present law in general outline except that it limited no-fault medical benefits and mandated arbitration of claims up to $3,000. Senate Bill 956 would have created a no-fault scheme, mandated arbitration, and created a state-financed auto insurance agency. Assembly Bill 675 would altogether have barred civil suits for bodily injury from auto accidents. Assembly Bill 954 would have put a ceiling on PIP benefits and would have created a rather high threshold for civil suits. Assembly Bill 1190 was in the same vein. Assembly Bill 1230 was much like the enacted law.
After picking its way through the thicket of possibilities, the Legislature enacted chapter 6A. Signing the bill into law on June 20, 1972, the Governor predicted that court cases "will be greatly reduced and that accident victims will be assured of prompt compensation for all economic losses". The Trentonian's May 17, 1972 editorial predicted that 69% of the auto accident claims "clogging the courts" would be eliminated. On the same day the Newark Star Ledger reported that insurance premiums could fall 24%. There had been massive efforts both for and against no-fault. Each side had its studies and statistics, demonstrating that the act would be either a total success or a total failure. The legislative judgment was for no-fault and its anticipated advantages.
*491 Other states went through much the same process. Many of them enacted various forms of no-fault. Because their acts differ, and because their local constitutions differ, their judicial treatment will not be discussed in this opinion. On the major constitutional issues involved in all no-fault schemes, of course, the opinions are of interest. Those states whose courts have upheld no-fault legislation against constitutional attack are Massachusetts, Pinnick v. Cleary, 271 N.E.2d 592 (Sup. Jud. Ct. 1971); New Hampshire, Opinion of the Justices, 113 N.H. 205, 384 A.2d 881 (Sup. Ct. 1973); Kansas, Manzanares v. Bell, 214 Kan. 589, 522 P.2d 1291 (Sup. Ct. 1974); Pennsylvania, Singer v. Sheppard, ___ Pa. ___, 346 A.2d 897 (Sup. Ct. 1975); Kentucky, Fann v. McGuffey, 534 S.W.2d 770 (Ct. App. 1975); Connecticut, Gentile v. Altermatt, Conn. (Sup. Ct. Err. 1975); and New York, Montgomery v. Daniels, 39 N.Y.2d 41, 378 N.Y.S.2d 1, 348 N.E.2d 444 (Ct. App. 1975). Courts have held no-fault legislation to be unconstitutional in significant respects in Illinois, Grace v. Howlett, 51 Ill.2d 478, 283 N.E.2d 474 (Sup. Ct. 1972); Florida, Lasky v. State Farm Ins. Co., 296 So.2d 9 (Sup. Ct. 1974) and Michigan, Gaines v. Mohawk Motor, Inc., No. 74-005-575 NI (Cir. Ct. 1974). There are a good number of enacted but yet untested similar laws in other states.
I find the No Fault Act to be constitutional. I do so with a constant eye on the strong presumptions of lawfulness accorded to legislation, and also on the undesirability of a trial court declaration of invalidity.

THE ACT DOES NOT DEPRIVE THE PLAINTIFFS OF DUE PROCESS OF LAW
The legislature may not deprive a person of life, liberty or property without due process of law. Judicial enforcement of that standard does not permit a court, however, to substitute its own policy judgment for that of the legislature. Ferguson v. Skrupa, 372 U.S. 726, 83 S.Ct. 1028, *492 10 L.Ed.2d 93 (1963). See Tribe, "The Supreme Court, 1972 term," 87 Harv. L. Rev. 1 (1973). The constitutional test is "reasonableness." Thus, if any state of facts reasonably may be conceived to justify the legislation, a court's duty is to sustain it. McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).
There were four policy bases for the No Fault Act: (1) increased reparation benefits (for those previously barred by fault tests); (2) reduction in the cost of auto insurance; (3) increased availability of necessary coverage, and (4) increased judicial economy. Without doubt, the objectives were worthy ones. The Legislature faced a mass of conflicting information and alternative suggestions for reaching the objectives. The result was legislation reasonably calculated to reform an area of the law that was not operating satisfactorily.
Plaintiffs argue that the Legislature was taken in by selected and distorted statistics, and was sold a "bill of goods" by special interests, and further, that the whole effort at reform has failed and inevitably had to. The argument is one peculiarly suitable to be directed to legislators. It is not one for judicial review. James v. Strange, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972).
In a lengthy appendix plaintiffs reproduce statistics, forecasts and promises that were before the Legislature at the time of enactment. They offer other documentation of the failure of no-fault to attain its objectives since its enactment here and in other states. Reviewing the material makes it plain that a good deal of salesmanship was brought to bear in the lobbying effort for no-fault. It is equally plain that no-fault has not been a great success. Insurance costs have risen. Court calendars have not been relieved. The major movement created by the act has been toward unforeseen no limit medical cost coverage for auto victims regardless of fault. Nothing much else has changed.
The Constitution does not forbid enactments of illfated legislation. It does not authorize retrospective judicial *493 review of the sincerity of the proponents' presentation or the accuracy of the legislative fact-finding. An act is not invalid because it does not work very well. At the time of enactment the No Fault Act was reasonably seen as a sensible remedy for a set of real problems. That is sufficient to satisfy the constitutional requirement of due process of law. It does not matter that there may have been other methods of reform the Legislature might have chosen. Chicago, Burlington & Quincy R. Co. v. McGuire, 219 U.S. 549, 569, 31 S.Ct. 259, 55 L.Ed. 328 (1911).

THE ACT DOES NOT DEPRIVE THE PLAINTIFFS OF THE EQUAL PROTECTION OF THE LAWS
Plaintiffs argue that the No Fault Act is unconstitutional in denying the plaintiff and others the equal protection of the laws in various ways. The Fourteenth Amendment's Equal Protection Clause addresses itself to the permissibility of governmentally-created classifications. Plaintiffs argue that many classifications created by the Act are unlawful and that the arbitrariness of the classifications, both individually and in combination, renders the entire act invalid.
Many of the classifications created by the act do not directly involve plaintiffs here. On that basis defendants say the court should not entertain the plaintiffs' arguments. In some instances, defendants are correct. Plaintiffs' overall position, however, is that the legislation is a total botch, infected throughout by improper classifications. For that reason, they contend, the total weight of the act's individual improprieties should make it fall. On that basis, and because plaintiffs represent insureds, an injured passenger meeting the threshold for suit, a PIP claimant and a civil defendant, it seems appropriate to entertain and deal with the total argument.
"Equal protection of the laws" guarantees that persons may may not be privileged or burdened by legislation that treats differently persons similarly situated. Washington Nat'l Ins. *494 Co. v. Board of Review, 1 N.J. 545 (1949). Equal protection does not, however, require that all persons be dealt with identically. The "rational basis" test, which is to be applied in the usual case of economic or social legislation, is rather uncritical.
If there is some reasonable basis for the recognition of separate classes, and the disparate treatment of the classes has a rational relation to the object sought to be achieved by the lawmakers, the constitution is not offended. The transgression arises only when the classification rests upon grounds wholly irrelevant to the achievement of the State's objective * * * [N.J. Chapter, Am. I.P. v. N.J. State Bd. of Prof. Planners, 48 N.J. 581, 601 (1967)]
A statutory classification should not be set aside if any state of facts reasonably may be conceived to justify it. McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).
The only exceptions to this quite permissive standard arise in the event of either (1) the creation of a "suspect classification"  for example, race (Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)), national origin (Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948)), indigency (Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956)), or illegitimacy (Gomez v. Perez, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973)), or (2) the infringement of a "fundamental right"  for example, the right to procreate (Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)), the right to interstate travel (Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)), the right to vote (Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972)), or the right of personal privacy (Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)). See State v. Krol, 68 N.J. 236 (1975). Where a suspect classification or a fundamental right is involved, the test is a much stricter one. To pass judicial muster the classification *495 must not only be rationally related to a valid public purpose, but further, it must be necessary to the achievement of a compelling state interest. Eisenstadt v. Baird, 405 U.S. 438, 447, n. 7, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). See San Antonio School District v. Rodriquez, 411 U.S. 1, 43 n. 73, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)[1].
This far stricter test of legislative classification has no place in the analysis and resolution of the issues involved here. As will appear below, none of the classifications made by the legislation fall into the "suspect" category, involving basic societal relationships and distinctions between persons that cry out for explanation. Similarly, legislative adjustment of the right to sue for auto accident injuries, unless done arbitrarily, does not touch any right fundamental to a free and democratic society. Any legal right or status becomes central and prominent to one who feels unfairly deprived of it. The Constitution properly reserves special treatment, however, for those rights and conditions whose preservation goes to the heart of a free society.
Plaintiffs' make a number of separate attacks on the No Fault Act as creating invalid classifications. They first assert that the act's permitting civil suit for major injuries but authorizing only PIP benefits for minor injuries is unlawful. They argue that making the distinction is itself improper and, further, that the manner in which major and minor injuries are distinguished by the act is arbitrary and capricious.
Section 8 of the act exempts owners and operators of PIP-covered vehicles from suit by PIP-covered persons with soft-tissue injury and medical expenses under $200. It permits suit for injury involving either medical expenses of at least $200 or death, permanent disability, permanent disfigurement or loss of body function or member, in whole or part.
*496 The law is permitted to treat large problems differently from small problems if there is a rational basis for the difference. Grave crimes carry heavier sentence exposure than less serious ones. Indicted criminal defendants are entitled to a jury trial, while persons charged with disorderly persons offenses are not. Superior Court litigants have a broader opportunity for pretrial discovery than county district court litigants. Small claims division litigants have hardly any discovery at all. Motor vehicle registration fees vary with vehicle size. Major land use subdivisions are regulated in ways that exempt minor subdivisions. First class counties have powers withheld from second class counties. Municipal contracts involving $2,500 in cost may be let only after public bid; most smaller ones need not.
Government deals every day with problems that lie somewhere between the trivial and the earth-shaking. They merit treatment according to their gravity. Some matters, such as tax rates and fees, can be quantified and graduated, automatically accounting for differences in relevant significance. Others, such as the maximum jurisdiction of an inferior court, the treatment of subdivisions, and the letting of municipal contracts, invite the drawing of fixed lines. There may be no compelling reason for the level at which a particular legislative line is drawn, but if there is to be a line, the precise location chosen by the Legislature ought to prevail unless it be grossly misplaced.
Among the purposes of no-fault are the reduction of court congestion, the avoidance of the high investigative and administrative costs of handling minor injury claims, and the elimination of the supposedly disproportionately high settlements of such claims. These purposes are all served by handling minor auto injuries out of court and out of the adversary process altogether. In order to achieve that goal, these minor matters must be first identified in order to be culled out. That identification must be accomplished by the drawing of a line.
*497 Plaintiffs argue that such a line is impermissible whereever it be drawn. There simply is no constitutional warrant, they contend, for depriving a group of persons of a cause of action allowed to others solely on the basis of the comparative gravity of the damages involved. They conclude that even if the Legislature can abolish the cause of action for auto negligence injuries across the board, it may not do so as to a particular class of claimants.
The legislative judgment was that a principal evil requiring correction was the injection of minor injury claims into the fault-oriented court system. That judgment was based on the reasonable interpretation of data available for consideration. Moreover, the legislative goal of compensating substantially all auto accident victims had to cost extra, because claims formerly weeded out by the fault system would be paid by the motoring public, at least in part, under no-fault. The overall community cost of that liberalization had to be absorbed somewhere. A suitable place for adjustment was in the area of minor claims for injuries of no permanent consequence to the victim. Restricting such minor claims to the payment of out-of-pocket costs would, it was reasonably thought, reduce their cost. Whether constitutionally necessary or not, a reasonable and adequate alternative was provided for the minor claimant. In the total legislative scheme, such an adjustment of the law is constitutionally permissible.
In order to separate minor from major injury claims, the legislature chose a combination of the $200 medical expense threshold and the distinction between soft-tissue and permanent injury. The level of the dollar threshold is unavoidably arbitrary. Every American jurisdiction that has adopted a form of no-fault legislation has created a higher threshold than ours. New Jersey's choice is not an unconstitutional one, any more than its choice of $2,500 to separate one class of municipal contracts from another is unconstitutional.
Plaintiffs argue that geographical variations in medical costs make the $200 threshold capricious in its application. *498 Medical costs certainly do vary, but no recognizable geographical pattern appears on this record. Such variations as may exist are insufficient to invalidate the otherwise reasonable legislative standard.
The distinction between soft-tissue and permanent injuries is a familiar one in personal injury litigation. It is suitably expressed in the statute. Of course, the active imagination can find potential injustices in its application to hypothetical auto accident victims. The professional concert violinist whose cut thumb requires only $190 in treatment but prevents him from playing the violin for six months may be contrasted with the machinist who breaks his fifth toe and loses two days from work. The violinist has no civil action against the tortfeasor, and the machinist has. Legislative lines drawn along a continuum to achieve a proper goal in the great majority of cases cannot be defeated by the spectre of an aberrational injustice. The distinction was drawn by the Legislature to achieve the permissible goal of distinguishing significant from insignificant injuries. It is suitable to achieve that goal fairly in the reasonably contemplable cases. It therefore does not offend the Constitution. Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).
Plaintiffs make the same kind of equal protection argument against the No Fault Act because it treats auto accident injuries differently from injuries from other kinds of negligent conduct. The common law action is the same, they say, and one kind of negligently-inflicted injury should not be treated differently from all of the others.
The simple answer is that auto accident injury claims were reasonably seen by the Legislature to present a special problem requiring reform. It was that class of claims that created the calendar congestion, that ate up the investigative and administrative insurance dollar, that represented justice worst delayed, and that most invited compensation without fault determination. Such claims plainly represent an identifiable *499 class whose unique treatment is justified by the special problems it creates.
Plaintiffs also argue that the act improperly discriminates against the poor. It does so, they say, because the poor normally receive medical care at lower cost and, therefore, are less able to reach the $200 medical threshold. Since the poor and others, such as servicemen, may receive free or subsidized care, the act takes account not only of actual medical expense but also of "equivalent value," giving them the opportunity to prove the real value of artificially depressed medical costs. In the absence of free or subsidized care, there is no proof on this record that physicians serve the economically depressed more cheaply than the well off. There is, therefore, no showing of discrimination.
Plaintiffs argue, further, that the poor are less able to afford to pay the costs of medical testimony for any hearing liminally required to prove satisfaction of the threshold requirements. The manner of such a determination has not been settled. See, e.g., Falcone v. Branker, 135 N.J. Super. 137 (Law Div. 1975), Rugamer v. Thompson, 130 N.J. Super. 181 (Law Div. 1974); Hammond v. Doan, 127 N.J. Super. 67 (Law Div. 1974). If the determination involves a pretrial medical hearing, or requires additional medical testimony at trial, the cost is incidental to the prosecution of plaintiff's claim. Lawsuits cost money and the Constitution has not been read to relieve an injured plaintiff of the burden beyond his ability to pay and impose the excess upon others or upon the community. Access to the courts, except in specific instances not here involved, is not constitutionally required to be subsidized.
Plaintiffs next argue that the treatment of non wage-earner as to PIP benefits is discriminatory. Section 4(b) of the act provides income continuation benefits for loss of income to an injured "income producer." Section 1(d) defines "income producer" as a person who, at the time of the accident, was in an occupational status, earning or producing *500 income. Income continuation benefits are, therefore, available only to persons currently employed. They are withheld from the temporarily laid-off worker who is called back but unable to return to work because of his injury, from the about-to-be-employed, and, perhaps, from the sporadically employed. If the worker is not entitled to PIP income benefits and has no civil suit because he falls short of the medical threshold, he has no income replacement from any source. This is troublesome. Section 4(b) may focus on too narrow a slice of the worker's life, that is, the moment of injury, thus creating an artificial and invalid class. This is not the problem of plaintiffs here, however, and the provision is severable. For that reason it seems preferable to await a real situation to which the exclusion applies for a ruling on its validity. Such a ruling is unnecessary to a determination of the present motion.
Plaintiffs next argue that the act creates a disadvantaged class, to which Mrs. Rybeck belongs, of those obliged to look to the same insurance policy for both PIP benefits and recovery of damages for fault. That is not a unique situation. Large insurers frequently appear in various roles in multiparty suits. Occasionally, the same carrier insures both vehicles in a two-car collision, or both tortfeasor and employer in a job accident leading to both a workmen's compensation petition and a civil action. Carriers frequently cooperate with one another in medical investigations. One new element created by PIP is the carrier's right to early medical investigation. See § 13. That is not an element raising issues of constitutional magnitude. Another new element is the carrier's power to cut off income continuation benefits and thus disadvantage the injured person's ability to maintain the negligence suit involving the same carrier.
Potential conflicts of interest are not uncommon in the casualty insurance industry. The carrier that offers itself as a protector and then turns adversary when a loss occurs shows a wholly new face and raises questions the layman finds *501 hard to answer. The kind of potential conflict plaintiffs here complain of is typical. It addresses itself to the nature of the industry and not to any constitutional prohibition.
Plaintiffs also argue that the law invalidly deprives Mrs. Rybeck as a married woman of the option either to obtain her own insurance or to remain outside of the no-fault system altogether. There is no basis for a women's liberation issue in this matter. Mrs. Rybeck is entitled to collect PIP benefits, and thus she is limited in her cause of action for negligence, not because she is a married woman but because she was a passenger in an automobile whose insurance policy conformed to the statute. Section 4 extends PIP benefits beyond family members to include all occupants of the insured automobile. She would be included if she were merely a hitchhiker. She is accorded no special status and deprived of no rights or benefits because she was married to the driver.
If her argument is that she should be able to purchase her own auto insurance with PIP benefits and thus be able to deal with her husband's carrier at arm's length if he injures her while driving, it is not clear that she may not do just that. Nothing in the record suggests that she tried and failed to do so. Of course, she would have to be a licensed driver and be prepared to register an insurable automobile. But since it is automobile insurance we deal with, that does not seem to be an excessive burden. In any event, the record on this motion reveals no discrimination against Mrs. Rybeck as a married woman. Her status is that of a passenger not covered by a separate policy providing PIP benefits. Her status is shared by some pedestrians, some nondrivers, some borrowers of covered automobiles, some guest passengers, and others not covered on a primary basis by their own auto policies. Her status is not unique to married women.
Plaintiffs next argue that the act creates irrational classifications by making an injured person's remedy depend on the nature and use of the vehicle that injures him. Section *502 2(a) defines "automobile" for the purposes of the act, thus describing those vehicles that are required to carry insurance providing PIP benefits. Section 2(a) reads as follows:
"Automobile" means a private passenger automobile of a private passenger or station wagon type that is owned or hired and is neither used as a public or livery conveyance for passengers nor rented to others with a driver; and a motor vehicle with a pick-up body, a delivery sedan or a panel truck or a camper type vehicle used for recreational purposes owned by an individual or by husband and wife who are residents of the same household, not customarily used in the occupation, profession or business of the insured other than farming or ranching. An automobile owned by a farm family co-partnership or corporation which is principally garaged on a farm or ranch and otherwise meets the definitions contained in this section, shall be considered a private passenger automobile owned by two or more relatives resident in the same household.
A number of things are covered here and not all of them with perfect clarity. Much of plaintiffs' dislike of the section springs from the thesis that the "not customarily used" clause applies to every sort of vehicle described in the section. If that were true, then a private passenger car customarily used to and from work and on business trips by its owner would not be covered by the act, while his homemaker wife's car would. The legislative history of the act, however, makes it apparent that the "not customarily used" clause applies only to vehicles described after the semicolon in § 2(b), that is, vehicles other than sedans, coupes and station wagons.
Between January and May 1972 seven unenacted bills proposing various forms of no-fault were introduced in the New Jersey Legislature. Each of them defined "automobile" for the purpose of inclusion. Not one proposed a definition so restrictive as that suggested by plaintiffs. Three of them included all road vehicles. The source of the act's definition plainly was the language of 1972 Senate Bill 517. The only substantial difference in that bill and the enacted definition is that in § 517 the language was separated into two parts, *503 labelled (1) and (2). The first part contained essentially the language before the semicolon in the present § 2(b). The second part started after the semicolon and included the "not customarily used" clause. In that version that clause plainly applied only to vehicles other than the usual private passenger or station wagon types. Omission of the numbers in the final version does not change the meaning. The semicolon clearly was intended to create the same separation of language.
The vehicles covered by the No Fault Act, therefore, are (1) all of the usual sedans, coupes and station wagons, however owned or used, other than taxis, busses, livery vehicles or others rented with a driver; (2) pick-up trucks, panel trucks, delivery sedans and camper-type vehicles used for recreation, owned by an individual person or married couple living together, not customarily used in the occupation, profession or business of the insured, other than farming or ranching. A farm family partnership or corporation qualifies as "two or more relatives resident in the same household," for whatever use that qualification may be.
The vehicles not included by the act are (1) motorcycles, taxis, livery vehicles and busses; (2) pickup trucks, panel trucks, delivery sedans, and campers if any of these are customarily used for business or are owned by any group or any firm or corporation other than an individual person or a married couple living together (except as to farm vehicles), and (3) all other highway vehicles, including trucks not specifically covered.
Some of the classifications have obviously reasonable bases. Motorcycles are left out because the available information showed that driver and passenger injuries are so frequent that no-fault premiums would be excessive. Trucks and other commercial vehicles are omitted because their occupants are normally covered by workmen's compensation, which provides income replacement and medical care for which PIP would be a duplication. Taxis, busses and livery vehicles were not covered because their drivers have workmen's compensation *504 protection and the coverage of passengers was felt to be excessive in cost.
The choice of what vehicles to cover was made on the basis of ownership and use, and not on the basis of who might be the victim. For that reason the pedestrian struck by a private auto receives PIP benefits while the pedestrian struck by a truck does not, unless, perhaps, he happens to be a beneficiary under his own policy.[2] The somewhat random treatment of pedestrians arises out of the vehicle-oriented classifications. Such classifications are, by and large, a reasonable way for the Legislature to approach the subject, and the rare pointless result does not affect this otherwise valid approach.
There are some vehicle classifications whose reasonableness is not so clear. None affects the total legislation, however, and none affects Mrs. Rybeck. Therefore, their validity need not be decided. It is difficult to avoid wondering, however, why a recreational vehicle is covered if owned by a person or a couple living together, but, apparently, is not covered if owned by two brothers or friends or a couple living separately. Moreover, a pickup truck used recreationally by a family that owns it through a close corporation is not covered. On the other hand, a pickup owned by a farmer seems to be covered, even if he uses it for farming. Such a farm pick-up, owned by a family corporation, is deemed to be owned by "two or more relatives resident in the same household." How does that help, if a nonfarm pickup owned by two or more relatives resident in the same household is not covered unless the relatives are married to each other? It does not serve to clarify this if one reads "individual" in the definition as "individual or individuals." N.J.S.A. 1:1-2. To do so makes hash out of the "husband and wife" and "relatives" language.
*505 Certain aspects of the definitional § 2(a) ought to be rethought and reworded. They lead to results for which there is no point at all. This is not, however, the proper case to invalidate the section. One hopes that the definition of "automobile" will receive further legislative attention.

THE ACT DOES NOT INVALIDLY DENY ACCESS TO THE COURTS AND TRIAL BY JURY
Plaintiffs argue that the No Fault Act unlawfully denies to Mrs. Rybeck access to the courts and trial by jury on all issues formerly so triable. They point to the prohibition contained in § 12 of the act barring proof of paid or collectible PIP benefits. They argue that it is constitutionally impermissible for the Legislature to diminish her cause of action for negligently caused injuries and remove some elements from the jury's consideration.
The argument unsoundly assumes that there is something fixed and changeless about a cause of action. It proceeds from the thesis that, somehow, the whole range of common law causes of action existing at the time of constitutional enactment are permanently guaranteed against diminution. Such a guarantee, one supposes, might prevent enlargement of existing causes of action and creation of newly enforceable rights, on the thesis that potential defendants also have rights.
The fact, of course, is otherwise. It is long out of doubt that there is no vested right in the current general law. The anticipation that the common law will not be changed may lawfully be disappointed. Wanser v. Atkinson, 43 N.J.L. 571 (Sup. Ct. 1881). See Morin v. Becker, 6 N.J. 457, 470 (1951). Compare Engler v. Capital Management Corp., 112 N.J. Super. 445 (Ch. Div. 1970), involving ongoing contractual rights. The common law is not a body of law graven in stone. Its great virtue, with or without legislative intervention, is its ability to adapt to changing times and circumstances. It can be improved judicially, Collopy v. Newark Eye and Ear Infirmary, 27 N.J. *506 29 (1958), or legislatively. One of the valid purposes of legislation is to remedy defects in the common law and to mold the law to new problems and needs. Munn v. Illinois, 94 U.S. [4 Otto] 113, 24 L.Ed. 77 (1876).
The New Jersey Constitution provides that "[a]ll laws, statutory and otherwise * * * in force at the time this Constitution * * * takes effect shall remain in full force until they * * * are superseded, altered or repealed by this Constitution or otherwise." Art. XI, § I, par. 3. This language plainly contemplates the free growth and development of the law in the light of conditions as they develop and to meet needs as they are felt.
The Legislature may properly abrogate or alter a common law right or remedy prospectively, even without furnishing a substitute. Magierowski v. Buckley, 39 N.J. Super. 534 (App. Div. 1956). (Quaere, however, whether causes of action regulating basic societal relationships may be abolished without furnishing an adequate substitute, a question involved neither in Magierowski nor here. See New York Central R. Co. v. White, 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667 (1917), Gentile v. Altermatt, Conn. (Sup. Ct. Err. 1975).) Some state constitutions contain a guarantee of a legal remedy for all injuries  a fact that has not been a bar to enactment of no fault statutes elsewhere. See Ruben and Williams, "The Constitutionality of Basic Protection, 1 Conn. L. Rev. 44 (1968). The New Jersey Constitution has no such provision.
Examples of the exercise of the legislative authority to abolish causes of action may be found in "guest statutes," abrogating the common law suit by an auto passenger against his host, Silver v. Silver, 108 Conn. 371, 143 A. 240 (Sup. Ct. Err. 1928), aff'd 280 U.S. 117, 50 S.Ct. 57, 74 L.Ed. 221 (1929); "heart balm" acts, abolishing actions for breach of promise or alienation of affections, Magierowski v. Buckley, supra; statutes protecting innkeepers from common law negligence actions, Sherwood v. *507 Elgart, 383 Pa. 110, 117 A.2d 899 (Sup. Ct. 1955), and "party-wall" statutes, Jackman v. Rosenbaum Co., 263 Pa. 158, 106 A. 238 (Sup. Ct. 1919), aff'd 260 U.S. 22, 43 S.Ct. 9, 67 L.Ed. 107 (1922). The workmen's compensation statutes are not good examples, since many, like ours, are elective in form and because all provide a statutory remedy replacing the common law action.
Plaintiff's rights, therefore, are to be measured by the law as of the date of her accident, a date after adoption of the No Fault Act. She had no vested interest in the state of the law before that time, made no contractual arrangements in reliance on the prior law, and had no constitutionally protected right to a cause of action in the form that previously existed.
In arguing that she has been deprived of both access to the courts and the right to jury trial, plaintiff adopts these slogan phrases as though they had some weight apart from her interest in the existence of the traditional common-law tort action. The fact is that one has a right to access to the courts only to prosecute claims cognizable there. Cf. Bodie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). One having a claim abrogated or limited by valid legislation is not deprived of access to the courts any more than one whose claim is outlawed by passage of the statutory time to sue. The same is true of the right to jury trial. That right exists as to claims that may lawfully be heard by a jury. It does not survive valid prospective legislation providing that the claim should not be heard at all. See Mountain Timber Co. v. Washington, 243 U.S. 219, 235, 37 S.Ct. 260, 61 L.Ed. 685 (1917).
In short, the legislature may validly abolish or alter a common law cause of action. Whether it can always do so without providing a "reasonable and adequate alternative" is not involved here. Such legislation does not invalidly bar access to the courts or to jury trial.

*508 ENACTMENT OF A RULE OF EVIDENCE
Section 12 of the act comes under special attack as an impermissible legislative invasion of the Supreme Court's rule-making power. Section 12 says:
Evidence of the amounts collectible or paid pursuant to sections 4 and 10 of this act [personal injury protection benefits] to an injured person is inadmissible in a civil action for recovery of damages for bodily injury by such injured person.
This is curious language. It seems to have two goals. The first is to enact that PIP benefits should not be recoverable again in a civil action. That purpose fulfills the spirit of the legislation. Its validity in that context is plain. Double recoveries throw excess cost onto the premium-paying public, and to no good purpose. The second goal, however, goes beyond that purpose. It is to silence trial witnesses on the subject of out-of-pocket loss to the extent that such loss is collectible or paid by a PIP carrier. Thus, it is admissible that a plaintiff went to the doctor and was treated by him and that he lost time from work, all as bearing on the severity of his injuries and the disability, discomfort and inconvenience associated therewith. But the cost of treatment and loss of income, if covered by PIP benefits, may not be mentioned.
This leads to the confusing and not infrequent situation that arises when a plaintiff's dollar losses are only partially covered by PIP. In that case plaintiff may prove the excess or net expense, and the jury may compensate him for it. Thus, consider the case where an injured $140 a week worker, out of work for eight weeks, received $100 a week for income continuation benefits. If the trial jury were to hear that he lost wages of $40 a week, it would be something of a puzzle to them in this day and age. The worker, say, also went to a physician 20 times and was charged $20 a visit. His PIP carrier paid only $15 a visit for 15 visits, feeling, perhaps rightfully, that the rest was unreasonable. The difference of *509 $175 was not worth plaintiff's while to litigate with the PIP carrier. If the trial jury should hear that he owes $5 for each of his first 15 visits and then, as he recovered from his injury, he incurred a cost of $20 for each of his last five visits, the testimony will not make sense to them.
The only way to make sense out of this situation to an alert jury is to tell them the truth, i.e., that the remainder of plaintiff's salary or expenses was defrayed by other sources and is not to be compensated again. But such an explanation flies in the face of § 12's prohibition. How simpler it might have been to leave the mechanism of a civil trial undisturbed and to create a lien for PIP benefits in the style of the lien created by the Workmen's Compensation Act in third-party actions.
The responsibility for the enactment of rules of evidence is a touchy subject in New Jersey. It was not resolved by Winberry v. Salisbury, 5 N.J. 240 (1950), cert. den. 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950), and its "procedure" versus "substance" analysis. Chief Justice Weintraub found it impossible to put a fixed label on evidence, seeing that it partakes of both the substantive and the procedural. Busik v. Levine, 63 N.J. 351, 367 (1973) cert. den. 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973). The same point was made by Dean Pound in his "Procedure Under Rules of Court in New Jersey," 66 Harv. L. Rev. 28, 30 (1952). See also, Hanna v. Plumer, 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).
The 1942 draft of what became the 1947 Constitution clearly gave the Supreme Court exclusive power over evidentiary rules. In their dialogue on the subject of a parallel 1944 draft at the convention, Governor Driscoll and Dean Sommer discussed the difficulties of that course. 4 Proceedings of the Constitutional Convention of 1947, 437. The result was the adopted Art. VI, § II, par. 3, which grants the court the power to regulate practice and procedure in the courts but gingerly omits to mention the subject of evidence rules.
*510 The rules of evidence later adopted wholesale in New Jersey were the product of a cooperative orchestrated effort by the three branches of government under the Evidence Act, 1960. N.J.S.A. 2A:84A-1 et seq. Under the arrangement, some rules were legislated. Others were adopted by the Supreme Court, subject to disapproval by the other branches. The plain purpose was to avoid a constitutional confrontation on the matter and to find a practical course by which the administration of justice could best be served. The legislative adoption of N.J.S.A. 39:6A-12 was outside the framework of accommodation erected by the Evidence Act.
There is no occasion here to resurrect the difficult question of authority to adopt rules of evidence. A fair reading of § 12 in the light of its purposes makes that unnecessary. Section 12 bars civil recovery of out-of-pocket losses covered by PIP benefits. So far so good. It goes further and says that evidence of such covered losses shall be inadmissible in an action for bodily injury damages. Clearly, the meaning is that such evidence shall not be admitted as direct proof of the extent of damages. Equally clearly, it does not mean that evidence of covered losses is inadmissible on any other legitimate issue to which such evidence might be relevant. So limited, § 12 is unimpeachable. If PIP-covered losses are not recoverable, then their extent does not directly bear on the issue of damages. Such evidence does not prove the severity of injury, the intensity or length of treatment, the pain and discomfort involved, or the extent of temporary or permanent disability.
This is not to say that there are no legitimate issues that may ever arise in an auto negligence trial that may properly be affected by proof of covered losses. It may be, for instance, that proof of reduction of a plaintiff's earning capacity should include evidence of his pre-injury weekly wage rate. It seems improper to bar that evidence just because the jury, which is capable of multiplying, has also heard that he lost a number of weeks from work. A properly instructed jury will be able to handle that information without misstep.
*511 Imagination suggests other possibilities that do not merit present exploration. The point is that a statute barring certain double recoveries can properly outlaw evidence that is offered for the sole purpose of achieving such double recoveries. That is a clearly substantive purpose proper to legislation and overbroad wording cannot becloud that fact. The same information may be relevant to other litigated questions, however, and must be admissible on those questions. Section 12 will not be read to make a boundaryless adjective prohibition that would achieve more than its legitimate purposes require.

CONCLUSION
The No Fault Act contains some minor provisions that, in a proper case, may create constitutional issues. As a whole, however, and on the record before me, the act does not offend the Constitution.
Plaintiffs' motion for summary judgment is denied.
NOTES
[1] N.J. Const. (1947), Art. I, par. 5, which embodies an equal protection guarantee narrower than its federal counterpart, expressly lists impermissible bases for classification.
[2] A pedestrian struck by a noncovered vehicle may or may not be in an "automobile" accident.