888 A.2d 526 (2005)
382 N.J. Super. 284
NEW JERSEY STATE BAR ASSOCIATION, a not-for-profit corporation, and Peggy Sheahan Knee, individually Plaintiffs,
v.
STATE of New Jersey, John E. McCormac, in his official capacity as Treasurer of the State of New Jersey; Holly C. Bakke, in her official capacity as Commissioner of the Department of Banking and Insurance; and Fred M. Jacobs, M.D., in his official capacity as Acting Commissioner of the Department of Health and Senior Services, Defendants.
Superior Court of New Jersey, Chancery Division, Union County.
Decided June 15, 2005.
*533 Edwin J. McCreedy (McCreedy & Cox), Cranford, for plaintiffs (Sharon A. Balsamo, James Condon, Charles J. Hollenbeck, on the brief).
Peter C. Harvey, Attorney General, for defendants (Patrick DeAlmeida, Assistant Attorney General, of counsel and on the brief, Marlene G. Brown, on the brief).
LYONS, P.J.Ch.
This action is before the court on cross-motions for summary judgment. The issues are:
A) Should the State be permanently enjoined from collecting the assessment prescribed in ง 27(b)(6) of the New Jersey Medical Care Access and Responsibility and Patients First Act ("the Act") because the section violates Federal and State equal protection guarantees, violates the substantive due process clauses of the Federal and State constitutions, violates state constitutional prohibitions on using public monies for a private purpose and violates the state constitutional prohibition on special legislation?
B) Do any of งง 5 through 8 of the Act violate the state constitution's separation of powers doctrine? and
*534 C) If individual provisions of the Act are found unconstitutional, should the entire Act be declared unconstitutional because the individual provisions are not severable?

I. Procedural Posture
This action was initiated by way of an order to show cause. Oral argument was heard on February 18, 2005, and the plaintiffs' request for preliminary injunctive relief was denied. The parties engaged in limited discovery and are before the court on cross-motions for summary judgment.

II. Facts
The facts are unchanged from those found by the court on the order to show cause and are undisputed.

A. Legislative History
On December 9, 2002, a bill designated the "Patients First Act of 2002" was introduced in the State Assembly. An identical bill was introduced in the State Senate on December 16, 2002. In March of 2003, various related bills that had been pending in the Legislature as early as May and June of 2002 were merged or substituted. The bills were renamed the "New Jersey Medical Care Access and Responsibility and Patients First Act."
The New Jersey Legislature held a series of hearings in 2002 and 2003 to address concerns and hear recommendations for improving health care quality and enhancing patient safety. The legislators were concerned with "A crisis, particularly in the area of OB/GYN because the reimbursements have gone down and the insurance has gone up,"[1] "a health-care emergency,"[2] and, "I don't know if disaster is the right word โ but a very serious patient-access risk to women in the State of New Jersey."[3] Testimony at the hearings came from physicians, representatives of consumer groups and attorneys including hospital executives,[4] personal injury lawyers,[5] representatives of lawyers' organizations,[6] and representatives of the Administrative Office of the Courts, who appeared at the request of the committees[7]. As the legislators tried to understand a number of concerns, the agenda was broad:
What we do understand from our meetings individually with physicians and insurance companies is that for the last 15 or 20 years, there has been stability in *535 the medical malpractice insurance market and that only over the last year has there been a problem in spiking of premiums, particularly for those involved in obstetrics and gynecology and those in high-risk surgery, where their premiums have skyrocketed pretty high.... We're looking for as much information as necessary to see what we need to do immediately and what needs to be some type of long-term cure, if any, that may be needed.
[Testimony concerning the affordability and availability of medical malpractice insurance for physicians practicing in New Jersey: Joint Hearing of the Assembly Health and Human Services and Banking and Insurance Committees; 210th Leg. Sess. [hereinafter June 2002 Hearing] (NJ June 2002) (comments of Assemblyman Cohen)].
The overarching concern that came out of the hearings and the problem the bill aimed to solve (as noted in the legislative purpose) as succinctly stated by Assemblyman Thompson was, "The reality of the situation that we're facing today is that, as a consequence of the cost of medical malpractice insurance, many physicians feel they cannot afford to practice medicine, and, therefore the medical services needed will not be available to our citizens." August 2002 Hearing (comments of Assemblyman Edwards). This statement was a reflection of the testimony that had come before the Legislature:
By now, we more fully understand the scope of this developing problem, especially as it pertains to specialties such as OB/GYN, emergency medicine, and surgery, and the surgical subspecialties. Even more disconcerting is the evidence that physicians in other specialties report high double-digit premium increases and fewer companies willing to write coverage. As the problem has grown, physicians and the entire New Jersey medical community have entered into a full-fledged state of crisis. When that happens, patients are in crisis.
[June 2002 Hearing (testimony of Bernard Saccaro, M.D., on behalf of the Medical Society of New Jersey)].
Physicians testified to problems that contributed to their high malpractice insurance premiums including being named in malpractice claims with which they had no involvement or in frivolous claims. Assemblyman D'Amato related that "[s]ome physicians ... complained about the fact that they're dragged through litigation that can last two to three years, and at the end of that litigation, the case is dismissed against them." August 2002 Hearing (comments of Assemblyman D'Amato). Assemblyman Cohen stated in the August 2002 hearing,
I'd like the Bar to think about ... those procedures that we can maybe come up with presuit, prefiling procedures, where we can sort out so that we're not going to have to file 12 John Doe, Jane Doe nurse and 12 John Doe, Jane Doe physicians, which you have to file just to protect your client and yourself .... prefiling procedures that can cut down on costs and try to bring cases to a quicker resolution.
A year later, responding to a doctor who testified to being named in suits in which she had never met the patient, Assemblywoman Weinberg assured the doctor that the legislation would provide a mechanism for getting out of a lawsuit early in such situations. Testimony on a proposal to provide medical malpractice insurance premium assistance for New Jersey physicians; Joint Hearing of the Assembly Health and Human Services and Banking and Insurance Committees; 210th Leg. Sess. (NJ May 2003) [hereinafter May *536 2003 Hearing] (comments of Assemblywoman Weinberg).
Of particular concern was the number of doctors, particularly obstetrician/gynecologists, who discontinued parts of their practice or retired altogether due to the inability to afford their liability coverage. "I figured out, in order for me to afford these huge premiums, I'd have to double or triple my volume, resulting in loss of quality care to my patients and also loss of quality of life for myself, and so I didn't have any other choice except to stop the obstetrics portion of my practice." May 2003 Hearing (testimony of Delores Williams, M.D.). "We need to try to address something immediately, because [a physician practicing today] might not be a practicing OB/ GYN come August." August 2002 Hearing (comments of Assemblyman Cohen).
Also present at the hearings were members of the Bar who testified that medical malpractice reform could be achieved by better policing of doctors or staying the statute of limitations during a special full disclosure discovery phase. They implored the committee members, "Please don't forget the victims of medical malpractice when you undertake your difficult responsibility." May 2003 Hearing (testimony of Ronald Goldfaden, Esq.). "Rather than talking about patient safety and curing the malpractice problem, we're talking about rates and caps and further restricting patients who are already restricted by the injuries that they've suffered." June 2002 Hearing (testimony of Michael Berger, Esq. on behalf of the Association of Trial Lawyers of America โ New Jersey). The New Jersey State Bar Association testified in support of creating a task force to study the issues further, and while it opposed an assessment, "if there is going to be some type of a fund, it should be a fund that's designed for premium relief rather than trying to pay for settlements or verdicts." May 2003 Hearing (testimony of Edwin McCreedy, Esq.).
As the legislation developed, two issues over which there was strong disagreement were direct medical malpractice liability premiums assistance and caps on damage awards for non-economic losses, which was a part of the then-current Senate version of the bill. S.B. 2174 ง 34 (as adopted March 17, 2003), 210th Leg. Sess. (NJ 2003). According to the Newark Star-Ledger, a "legislative stalemate" developed in 2003 over the Senate's version of the bill "that limited how much negligent physicians or their insurers would have to pay for a patient's pain and suffering." Robert Schwaneberg, Bill Offers Insurance Relief Fund to Doctors: Malpractice Reform Heads to Governor, Newark Star-Ledger, May 25, 2004.
The bills were reintroduced in the subsequent legislative session (the 211th Leg. Sess., 2004-2005). Throughout March of 2004, the bills were debated and amended. On March 29, 2004, and May 24, 2004, the final bill passed the Senate and Assembly, respectively. On the day the final bill passed the Assembly, there had been an attempt to amend the bill to include a $250,000 limit on jury awards for pain and suffering; however, the bill passed without amendment. Robert Schwaneberg, Bill Offers Insurance Relief Fund to Doctors: Malpractice Reform Heads to Governor, Newark Star-Ledger, May 25, 2004.
The goals of the final legislation, were to "reform the State's ailing medical malpractice insurance system to provide insurance relief for doctors and ensure that patients in New Jersey" will be able to get the treatment they seek. Press Release, Office of Senators Vitale and Lesniak (March 22, 2004). Senator Vitale said, "By all accounts, the current crisis in medical malpractice liability insurance is driving good doctors out of the state." Ibid. The legislation *537 was described by Assemblyman Roberts as providing "a comprehensive package of more than 20 tort law, healthcare system and insurance regulatory reforms." Press Release, Office of Assemblyman Joseph Roberts (March 11, 2004).
The Act was signed into law on June 7, 2004, as P.L. 2004, c. 17. The final bill, addressing medical professional liability, insurance reform and patient protection, contained legislative findings that,
a. One of the most vital interests of the State is to ensure that high-quality health care continues to be available in this State and that the residents of this State continue to have access to a full spectrum of health care providers, including highly trained physicians in all specialties;
b. The State's health care system and its residents' access to health care providers are threatened by a dramatic escalation in medical malpractice liability insurance premiums, which is creating a crisis of affordability in the purchase of necessary liability coverage for our health care providers;
c. One particularly alarming result of rising premiums is that there are increasing reports of doctors retiring or moving to other states where insurance premiums are lower, dropping high risk patients and procedures, and practicing defensive medicine in a manner that may significantly increase the cost of health care for all our citizens;
d. The reasons for the steep increases in the cost of medical malpractice liability insurance are complex and involve issues related to: the State's tort liability system; the State's health care system, which includes issues related to patient safety and medical error reporting; and the State's regulation and requirements concerning medical malpractice liability insurers.
e. It is necessary and appropriate for the State to take meaningful and prompt action to address the various interrelated aspects of these issues ....
[P.L. 2004, c. 17 ง 2.]
Governor McGreevey's statement upon signing the bill noted, "Our overriding priority is to ensure that patients have access to doctors and quality health care and this bill meets that objective ...." Press Release, Office of Governor James E. McGreevey (June 7, 2004). The Act is described as "the best compromise to get something done without burdening one group over another," and to "help doctors without unduly hurting someone else." Id. (statements of Senator Vitale).

B. Overview of the Act
The Act "provides for a set of reforms of the state's tort liability system, health care system and medical malpractice liability insurance carriers to ensure that health care services continue to be available and accessible to residents of the State and to enhance patient safety at health care facilities." P.L. 2004, c. 17, ง 2(f).
Section 27 of the Act establishes a Medical Malpractice Liability Insurance Premium Assistance Fund with revenue coming from a number of annual assessments running for three years, including a $75 annual fee payable by each person licensed to practice law in the State. The assessment
does not apply to attorneys who: are constitutionally or statutorily barred from the practice of law; can show that they do not maintain a bona fide office for the practice of law in this State; are completely retired from the practice of law; are on full-time duty with the armed forces, VISTA or the Peace Corps and not engaged in practice; are ineligible to practice law because they have not made their New Jersey Lawyers' Fund for Client Protection payment; *538 or have not practiced law for at least one year.
[P.L. 2004, c. 17, ง 27(b)(6).]
Additional revenue will come from an annual charge of $3 per employee for all employers who are subject to New Jersey's unemployment compensation law and a $75 annual charge on physicians and podiatrists, chiropractors, dentists, and optometrists, with some exceptions. P.L. 2004, c. 17, ง 27(b)(1)-(5).
The State Treasurer is required to deposit all revenue collected pursuant to ง 27 into the Medical Malpractice Liability Insurance Premium Assistance Fund. All revenue in the fund is to be used exclusively for purposes specified in the Act including relief of medical malpractice liability premiums, health care subsidies to hospitals, and student loan expense reimbursement for obstetrician/gynecologists. P.L. 2004, c. 17, ง 27(e).
The Act also makes changes to medical malpractice court actions. The Act provides a mechanism for a judge presiding over a medical malpractice action to refer the matter to complementary dispute resolution pursuant to R. 1:40 if it might encourage early disposition or settlement of the action. P.L. 2004, c. 17, ง 5.
Under ง 6 of the Act, a health care provider named as a defendant in a medical malpractice action may have the action against him or her dismissed upon filing an affidavit of noninvolvement with the court, setting forth the particular facts that demonstrate the provider was misidentified or otherwise not involved in the care or treatment of the claimant, was not obligated to provide care or treatment and could not have caused the alleged malpractice. P.L. 2004, c. 17, ง 6(a). The provider's affidavit can be challenged by motion filed with an affidavit contradicting the assertions in the provider's affidavit of noninvolvement. If the court determines the affidavit was falsely filed or contained false or inaccurate statements, the court, upon motion or its own initiative, shall reinstate the claim against the provider. P.L. 2004, c. 17, ง 6(c). The court may also impose sanctions against a plaintiff who falsely objected to a provider's affidavit of noninvolvement or knowingly provided an inaccurate statement regarding the provider's affidavit.
Section 7 of the Act specifies qualifications that must be met by persons giving expert testimony such as being a specialist or subspecialist recognized by the American Board of Medical Specialties or the American Osteopathic Association in the same specialty or subspecialty at issue in the action, or meeting requirements for active clinical practice or instruction of students in an accredited medical school. Similar requirements must be met by a person filing an affidavit that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint fell outside acceptable professional or occupational standards or treatment practices, pursuant to ง 8 of the Act.

C. Constitutional Challenge
Plaintiffs filed this action on January 3, 2005, seeking, pursuant to N.J.S.A. 2A-16-50, a declaratory judgment that the Act denies New Jersey attorneys due process and equal protection of the law in violation of the Fifth and Fourteenth Amendments of the United States Constitution and N.J. Const. art. I, ถถ 1 and 5; a declaration that the Act directs the use of public money for a private purpose in violation of N.J. Const. art. VIII, ง 3, ถ 3; a declaration that the Act constitutes special legislation in violation of N.J. Const. art. IV, ง 7, ถถ 7, 8 and 9; a declaration that the Act unfairly impinges upon the ability of attorneys *539 and clients to pursue meritorious claims through the judicial system by violating the exclusive rule-making authority of the Supreme Court of New Jersey established by N.J. Const. art. VI, ง 2, ถ 3 and the separation of powers doctrine.
Collection of the annual fee is executed by the Department of the Treasury's Division of Taxation. In November of 2004, the Division of Taxation began sending bills to attorneys in the State, requiring payment within 30 days of receipt. By the end of 2004, 30,000 notices to attorneys licensed to practice law in the State had been issued. Certification of Arthur Guenther, Jr., Division of Taxation ถถ 3-4. Not all attorneys who are liable for the annual fee have been noticed. Certification of Arthur Guenther ถ 4. As of January 24, 2005, 20,300 attorneys had paid the fee; 397 claimed they were exempt; and 200 of the payments were made "under protest." Certification of Arthur Guenther ถถ 5-6.
In the present application, plaintiffs ask the court to permanently enjoin defendants, their agents, employees and attorneys, and those in active concert or participation with defendants who receive actual notice of the court's order, from enforcing or attempting to enforce ง 27 of the Act or collecting or attempting to collect the fees imposed by ง 27 of the Act.

III. Summary Judgment
A motion for summary judgment shall be granted if the evidence demonstrates that there is no genuine issue of material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. R. 4:46-2(c); see also Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 539-540, 666 A.2d 146 (1995).
Under R. 4:46-2 a motion for summary judgment should be granted if pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, reveal that there is no genuine issue as to any material fact. In Brill, supra, the New Jersey Supreme Court set forth the standards by which questions of material fact are to be examined. The Court stated,
A determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in a light most favorable to the non-moving party, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of a non-moving party.... The import of our holding is that when the evidence is "so one-sided that one party must prevail as a matter of law" the trial court should not hesitate to grant summary judgment.
[Id. at 540, 666 A.2d 146 (citations omitted).]
Here, the facts are drawn from the Act itself and the legislative history. They are not in dispute. The determination of the legislative enactment's constitutionality is appropriately resolved by way of a motion for summary judgment.

IV. Equal Protection and Due Process
Plaintiffs argue that the Act is unconstitutional under both the New Jersey State and Federal Constitutions. Plaintiffs maintain that the Legislature has failed to show a rational basis for imposing a $75 fee on attorneys; that the assessment here is not justified because the Act irrationally applies to some attorneys and not others and is devoid of any findings that either would tie attorneys to the faults in the medical malpractice or tort systems or would show that attorneys derive any financial benefit from a stable medical malpractice insurance market. Thus, plaintiffs *540 conclude that the assessment lacks a fair and rational relation to the object of the legislation and summary judgment is appropriate. Defendants, on the other hand, maintain that the Legislature has articulated a rational basis for including attorneys in the class of individuals to be taxed, and because plaintiffs have not met their burden of overcoming the presumed constitutionality of the statute, summary judgment in favor of the State is appropriate.
Since an analysis of the State and Federal Constitutions is implicated by the parties' claims, a brief survey of the constitutional standards at issue is warranted.

A. State Equal Protection Standard
The parties agree that no fundamental right is at issue. Therefore, under equal protection analysis, since a fundamental right is not burdened, the statute will satisfy the requirement of equal protection if it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination. Bd. of Educ. of Piscataway Tp. v. Caffiero, 86 N.J. 308, 324, 431 A.2d 799 (1981).
Legislatures have wide discretion in passing laws that have the inevitable effect of treating some people differently from others, and legislative classifications are valid unless they bear no rational relationship to a permissible state objective. A legislative classification will be upheld unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational .... [A] state may undertake resolution of problems one step at a time, addressing itself to the part of the problem that seems most acute. A statute does not violate equal protection simply because it is underinclusive or could have been drawn more precisely to accomplish the governmental objectives.
[Bd. of Educ. of Piscataway Tp., supra, 86 N.J. at 324, 431 A.2d 799 (emphasis added).]

B. State Due Process Standard
The guarantee of due process provides that as long as the means chosen by the Legislature have a rational relation to obtaining the objective sought, the statute will not be in violation of due process of law as an arbitrary or capricious enactment. Robson v. Rodriquez, 26 N.J. 517, 522, 141 A.2d 1 (1958).
Substantive due process does not protect against all governmental actions that infringe on an individual's liberty interests or injure property rights. Rather, [it] is reserved for the most egregious governmental abuses, ... abuses that shock the conscience or otherwise offend ... judicial notions of fairness... [A] presumption of validity attaches to ... statutes and this presumption is particularly daunting when [the] statute attempts to protect the public health, safety or welfare. The burden on a proponent of such a statute's invalidity is a heavy one.
[In re Certificate of Need Granted to the Harborage, 300 N.J.Super. 363, 386, 693 A.2d 133 (App.Div.1997).]

C. Federal Equal Protection Clause Standard
The parties agree that no fundamental right, or suspect or semi-suspect class is at issue. Thus, the rational relation test applies, under which, "the Equal Protection Clause is offended only if the statute's classification `rests on grounds wholly irrelevant to the achievement of the State's objective.'" N.J. State Bar Ass'n *541 v. Berman, 259 N.J.Super 137, 146, 611 A.2d 1119 (App.Div.1992). Where social or economic legislation is at issue, "`[w]e will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.'" N.J. State Bar Ass'n v. Berman, 11 N.J.Tax 433, 441 (1991) (quoting Kadrmas v. Dickinson Pub. Schs., 487 U.S. 450, 462-463, 108 S.Ct. 2481, 2490, 101 L.Ed.2d 399, 412 (1988)).

D. Federal Due Process Standard
Due Process analysis calls for a determination of whether the state legislative purpose and means employed are constitutionally permissible. The legislation must bear a rational relationship to a constitutionally permissible objective. Permissibility of the state legislation rests upon the state's police power. The state may, in the exercise of its police power, take such action as in its judgment is appropriate to promote and protect the public health, safety and welfare. This is a broad power.
[Chamber of Commerce of the U.S. v. State, 89 N.J. 131, 155, 445 A.2d 353 (1982).]
To pass constitutional muster, then, the Act must further some legitimate state interest; the means used must be reasonable as opposed to arbitrary and capricious; and ง 27 of the Act must bear a rational relation to the legislative objective sought to be obtained.
The presumption is that the Legislature intended to act constitutionally when it enacted the statute; that it acted wholly within its allotted sphere; and from adequate factual support. The presumption is not overcome and a legislative enactment will not be declared void unless its repugnancy to the Constitution is so manifest as to leave no room for reasonable doubt, or the statute plainly exceeds the constitutional power of the Legislature.
[N.J. Ass'n of Health Plans v. Farmer, 342 N.J.Super. 536, 551, 777 A.2d 385 (Ch.Div.2000) (internal citations omitted).]
Further, where taxation is at issue, a state legislature is accorded "the widest possible latitude within the limits of the Constitution." Carmichael v. So. Coal Co., 301 U.S. 495, 510, 57 S.Ct. 868, 872, 81 L.Ed. 1245, 1253 (1937). See also Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973); Madden v. Ky., 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940).

E. Equal Protection and Due Process Analysis
Here, the governmental objective of the Act is clear. The Legislature believes that access to a `healthy' healthcare system is one of the most vital interests of the State. See, P.L. 2004, c. 17 ง 2(a). But as already stated the Legislature believes that the system is in crisis and patients' access to the system is in jeopardy. See, P.L. 2004, c. 17 ง 2(b). The title, legislative findings and declarations of the Act make clear that the legitimate governmental objective is to ensure that high quality health care continues in New Jersey. Indeed, plaintiffs concede that the Act addresses a valid public purpose. (Br. in Support of Pl.'s Mot. for Summ. J. at 23).
Plaintiffs, however, continue to argue that there is no rational relationship between the government's objective, to prevent a crisis in health care, and attorneys because attorneys as a class did not create the situation to be remedied and do not derive a benefit from this statute. In response, *542 the court examined whether there is any natural relationship between attorneys and the statute and whether the Legislature may impose a taxation scheme only upon those who will derive a benefit from the tax or who caused the crisis sought to be cured. This court has listed numerous ways in which attorneys interact with and derive benefit from a stable health care system through general healthcare business counseling and through representation of acute-care hospitals, physicians and dentists, physician groups ... and all manner of healthcare employers whether it be in a corporate capacity, litigation capacity or regulatory capacity. See New Jersey State Bar Association v. State of New Jersey, No. C-1-05 (Ch. Div. February 18, 2005) at 34-36 for complete discussion (hereinafter referred to as "slip op."). Plaintiffs nonetheless maintain that the court has stretched what they regard as tangential interactions between the Bar and the healthcare system into a constitutional argument for validating the Act. Plaintiffs argue that if the Legislature can tax attorneys for problems in the healthcare system then what is to stop it from taxing hairdressers whose customers are doctors or drycleaners who clean suits for doctors or real estate brokers who sell houses to doctors. Plaintiffs conclude that attorneys are no more and no less related to the healthcare industry than any of these other occupational groups. In other words, the relationship between doctors and attorneys is only as rational as the relationship between doctors and any other service provider that a doctor might encounter during his lifetime.
Plaintiffs' argument necessarily raises the issue of what constitutes a "rational" relationship. The case law tells us that it is any relationship that is not arbitrary and capricious. Robson v. Rodriquez, supra, 26 N.J. at 522, 141 A.2d 1. Dictionaries define the word "rational" as (1) having reason or understanding and (2) relating to, based on, or guided by reason, principle, fairness, logic, a legitimate state interest, or a consideration of fact. Merriam Webster's Dictionary of Law 405 (1996). Synonyms for the adjective "rational" are: agreeable to reason, analytical, balanced, cerebral, clearheaded, logical, plausible, reasonable, sane, sensible, sound, well grounded, tenable. Burton's Legal Thesaurus 446 (3d ed. 1998).
In this case, we must determine whether the Legislature had any logical, plausible, reasonable basis for concluding that attorneys have a rational relationship to the health care industry in general and medical malpractice relief specifically such that attorneys should pay the fee at issue.
A review of the competent evidential materials presented indicates three reasonable bases for the Legislature to have assessed attorneys: (1) there is a strong interrelationship between the legal needs of the medical community and the practice of law as articulated in the court's prior opinion in this case (slip op. at 34); (2) the legal profession's representatives have shown a keen interest in the issues raised in this legislation and have lobbied vigorously to advance its positions, including testifying at the hearings;[8] and (3) given *543 the Legislature's findings that the State's tort liability system is one of the causes of the current crisis and that some groups sought to substantially change aspects of that system, specifically by imposing a cap on non-economic damage awards, which the organized Bar strenuously opposed and defeated, it would appear logical and reasonable for the Legislature to conclude that attorneys should become a part of the legislative solution. Thus, it was not irrational for the Legislature to conclude that if the State's tort liability system is a cause of the current problem and attorneys are desirous of preserving that system as well as playing a role in the reformation of the medical malpractice system then it is reasonable that they be called upon to help pay for it.[9]
*544 Having reviewed the legislative committee hearings, it is clear that the Legislature enacted a compromise based on input from different groups representing *545 conflicting interests including physicians and attorneys.
Plaintiffs' steadfast position that there is no rational relationship between the Act and attorneys is particularly untenable in light of the Bar Association's actions. The voluntary testimony of two leaders of the State's legal community, and other attorneys, testifying about their representation of all attorneys and their activism on this critical issue do not support a finding that the Legislature was arbitrary, capricious and irrational in concluding that the New Jersey Bar has an interest in the future of the healthcare system and in reforming the medical malpractice situation in particular. The Latin maxim facta non verba โ actions speak louder than words โ comes to mind here after an examination of the Act's history and the Bar's role in it.
If plaintiffs are now arguing that a large majority of members have no interest in this field, then plaintiffs' position raises questions as to why the Bar Association has taken such a prominent role in this issue; why are they lobbying for a cause that most of them care nothing about; and why should the Legislature look beyond the strong NJSBA showing of interest and conclude that most attorneys in New Jersey have nothing to do with and derive no benefit from a stable healthcare system.
Plaintiffs may be ultimately correct in their conclusion that there is no healthcare "crisis" in New Jersey and, thus, the fund is not warranted. However, it is not within the purview of the courts to second-guess the findings of the Legislature as long as the Legislature acts within constitutional limits. This court's role is not to grant a judicial imprimatur as to the wisdom of the Act but to assess its constitutionality. "It is well recognized that the courts do not act as a super-legislature." Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212, 222, 486 A.2d 305 (1985).
Having cited a number of logical and plausible connections between lawyers and the health care system, the court does not find that the Legislature's decision to tax attorneys was wholly irrational or arbitrary. In fact, in light of the interest that plaintiffs showed during passage of the Act, the court finds that the Legislature made a logical assumption that attorneys have an interest in the future stability of the health care system that is greater than the interest shown by other groups who made no appearance.
Finally, plaintiffs argue that the Legislature's classification excluding attorneys who do not have offices within the State, is constitutionally defective although plaintiffs do concede that perfection is not required and failure to include in a class some persons who share characteristics of the class is not fatal so long as there is a rational reason for doing so. (Br. in Support of Pl.'s Mot. for Summ. J. at 25, 26). See also Vance v. Bradley, 440 U.S. 93, 108, 99 S.Ct. 939, 948, 59 L.Ed.2d 171, 183 (1979) (even if the classification is both underinclusive and overinclusive, perfection is not required to satisfy equal protection standards; such imperfection can be rationally related to the secondary objective of legislative convenience); Schweiker v. Wilson, 450 U.S. 221, 235, 101 S.Ct. 1074, 1083, 67 L.Ed.2d 186, 198 (1981) (as long as the classification is reasonable, we must disregard the existence of other methods of allocation that we, as individuals, perhaps would have preferred); Drew Assoc. v. Travisano, 122 N.J. 249, 262, 584 A.2d 807 (1991) (remedial legislation need not be all or nothing, and the Legislature can decide that to start somewhere is better than to start nowhere).
*546 This court must give wide latitude to the Legislature's classification. The Legislature may have decided not to tax New Jersey licensed attorneys with out-of-state offices for many reasons including administrative convenience or that the revenue that will be derived from in-state attorneys is sufficient for the state's present purpose. Or, as the State points out, since out-of-state attorneys (without a bona fide New Jersey office) were not permitted to practice law in New Jersey on a regular basis prior to January 2004 and the problems causing the crises arose prior to that time, the Legislature might have concluded that they cannot reasonably be held accountable for the problem. Under the standards cited above, that is all that this court is required to conclude โ that the Legislature conceivably had a basis for making the distinctions within the classification that it did. Having just articulated such a basis, the court finds that there is no constitutional defect in the Legislature's distinction between in-state and out-of-state attorneys.
Thus, plaintiffs have not met their burden of putting forth evidence to create a "genuine" issue of material fact as to their due process and equal protection claims. Under both the federal and state constitutional standards, the rational basis test requires only that the Act further a legitimate governmental objective. The means used must be, by any conceivable set of facts, rationally related to the objective. Here, the Legislature conducted hearings and concluded that the state's health care system is in trouble. Various attorneys voiced their concern on the impact of some proposals on the Bar and the public. The financial interdependence between the Bar and a stable health care system is apparent. The Act that resulted provides a revenue stream for the State to address some of the more pressing problems, and creates a task force, on which the Bar will have a voice, to further study the long-term issues. The plaintiffs have, therefore, not met their substantial burden of showing that "the classification is wholly irrelevant or unrelated to the achievement of the objective, that the classification is an explicit demonstration of hostile and oppressive discrimination, and has not negated every conceivable basis which may support the classification." Berman, supra, 11 N.J.Tax at 449. Thus, the court finds that as to the due process and equal protection claims the State is entitled to judgment as a matter of law.

V. Public Funds for a Private Purpose
The New Jersey Constitution prohibits donations of public funds for private purposes. N.J. Const. art. VIII, ง 3 ถ 3 provides, "No donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatever." This provision was added to the Constitution when it was amended in 1875 because of "a number of abusive practices that occurred during the nineteenth century when railroads and other private corporations were provided direct public assistance to the serious detriment of the taxpayers under the guise of `encouraging development'." Davidson Bros., Inc. v. D. Katz, & Sons, Inc., 121 N.J. 196, 217, 579 A.2d 288 (1990) (quoting Roe v. Kervick, 42 N.J. 191, 212, 217, 199 A.2d 834 (1964)). See also, Hill v. City of Summit, 64 N.J.Super. 522, 528-529, 166 A.2d 610 (Law Div.1960). "The underlying principle is that `public money should be raised and used only for public purposes'." Bryant v. City of Atlantic City, 309 N.J.Super. 596, 611, 707 A.2d 1072 (App. Div.1998) (quoting, Roe, supra, 42 N.J. at 212, 199 A.2d 834) (citing, N.J. Sports & Exposition Auth. v. McCrane, 119 N.J.Super. *547 457, 472, 292 A.2d 580 (Law Div. 1971)). New Jersey courts employ a two-part test to determine whether an act is constitutional under the above section: "First, whether the provision of financial aid is for a public purpose, and second, whether the means to accomplish it are consonant with that purpose." Bryant, supra, 309 N.J.Super. at 612, 707 A.2d 1072 (citing Roe, supra, 42 N.J. at 212, 199 A.2d 834). The second prong is addressed by looking at two subsidiary matters. First, whether the transaction is contractual and involves some obligation on the part of the private entity that is intimately tied to fulfilling the public purpose. Second, whether the accomplishment of the public purpose is the paramount factor in the contract with any private advantage being merely incidental or subordinate.

A. Public Purpose
The expenditures of the Act are directed at a public purpose. To meet the public purpose prong of the test, "[t]he activity must be one that `serves a benefit to the community as a whole, and which, at the same time is directly related to the function of government.'" Davidson Bros., supra, 121 N.J. at 217, 579 A.2d 288 (quoting Roe, supra, 42 N.J. at 207, 199 A.2d 834).
An elementary object of government is to protect and further the health, safety and general welfare of the people. All of its myriad activities have that end in view. Whenever a condition of affairs appears in the state which presents a substantial threat to the accomplishment of that object, a governmental duty arises to apply within constitutional limits whatever measures are necessary and appropriate to check it.
[Roe, supra, 42 N.J. at 212, 199 A.2d 834 (loans to private agencies to establish redevelopment projects for purpose of alleviating unemployment in designated areas is governmental in nature) (citing N.Y. City Housing Auth. v. Muller, 270 N.Y. 333, 1 N.E.2d 153 (1936)).]
The Legislature declared that the Act "provides for a comprehensive set of reforms... to ensure that health care services continue to be available and accessible to residents of the State ...." That this is a public purpose is self-evident. According to the Legislature's findings, a condition of affairs appeared in New Jersey whereby "residents' access to health care providers [is] threatened" and doctors are practicing medicine in a way that "may significantly increase the cost of health care for all our citizens." P.L. 2004, c. 17 ง 2. Thus, the expenditures provided for by the Act have a public purpose: assuring access to health care services. Access to such services benefits the community as a whole in a myriad of ways including disease prevention, promotion of overall wellbeing, increased information and awareness of health issues and improved school and work attendance and performance. It is evident that the State cannot protect and further the health of the people without doctors, who, necessarily, are the mechanism for providing the health care services.

B. Means Consonant with the Public Purpose
Although the purpose is recognized as public, "the legislative mechanism employed to accomplish it cannot conflict with the constitutional proscription against the lending of the State's credit or the appropriation of money" to a private person or corporation. Roe, supra, 42 N.J. at 216, 199 A.2d 834. The prohibition of N.J. Const. art. VIII, ง 3 ถ 3 does not mean that "the State and its political subdivisions cannot buy and pay for what they need to achieve public purposes." Roe, *548 supra, 42 N.J. at 217, 199 A.2d 834. The Act satisfies the second prong because the means employed are consonant with the public purpose.

1. Contract and Consideration Furnished
When considering the means to accomplish the public purpose, a court must first ask, "Is the transaction, involving the transfer of money, contractual in nature and if so, is it based upon a substantial consideration from the recipient of the money ... which consideration is intimately associated and burdened with execution of the public purpose of the statute?" Id. at 218, 199 A.2d 834 (where the means was a loan, the court considered whether there was substantial consideration apart from the obligation to repay the loan with interest). Where the scope and public purpose of a private entity's "agreed undertaking [is] clearly delineated and circumscribed by legislation," the relationship between the entity and the government is contractual. Ibid.
However, when evaluating the consideration furnished, the court is not limited to a strict contractual interpretation. "Public appropriations which are founded upon some legal, equitable or moral consideration to the State are not prohibited by this constitutional provision. The accomplishment of an important public object or moral duty to the citizens of the State is sufficient to sustain the validity of the appropriations. It is not essential that the consideration meet the test of adequate consideration in the strict contract sense." Trustees of Rutgers College in New Jersey v. Richman, 41 N.J.Super. 259, 298, 125 A.2d 10 (Ch.Div.1956) (citing Morris & Essex Railroad Co. v. City of Newark, 76 N.J.L. 555, 560, 70 A. 194 (E. & A. 1908)).
Two uses of the fund are challenged as appropriations to a private person: the $17 million annual allocation to provide medical malpractice liability insurance premium subsidies to certain health care providers in the State, and the $1 million annual allocation for a student loan reimbursement program for obstetrician/gynecologists. P.L. 2004, c. 17 ง 27(e)(1) and (3). Here, the fund in general, and particularly the subsidies and loan reimbursements of the Act, are simply part of a broad set of reforms, the total aim of which is to ensure access to health care. The legislation and the implementing regulations tailor the expenditure to achieving the purpose of the legislation.
The insurance premium subsidies are to be available to New Jersey health care providers who meet certain criteria established by regulations of the Department of Banking and Insurance ("DOBI"). To administer the subsidies program, the Act calls on the DOBI Commissioner to, by regulation, "establish a methodology and procedures for determining eligibility for and providing subsidies from, the fund." P.L. 2004, c. 17 ง 28(a)(2). The Act requires that the providers must have experienced or be experiencing a liability insurance premium increase of an amount set by regulation.[10] Further, the Act requires the Commissioner to certify classes of providers by specialty or subspecialty whose average premium is in excess of an amount set by regulation and provide subsidies to those classes. Consideration may be given to whether "access to care is threatened by the inability of a significant number of practitioners, as applicable, in a particular specialty or subspecialty, to continue practicing in a geographic area of the State." *549 P.L. 2004, c. 17 ง 28(b). The scope and public purpose of the subsidy recipient's agreed undertaking are clearly delineated and circumscribed by legislation and regulations.
The burden to be undertaken by the recipients of the subsidies is provided by the regulations. "[A] practitioner who receives a premium subsidy ... shall thereafter be required to continue to practice at least to the same extent (for example, full-time or part-time and no restriction in specialty or subspecialty) in that practitioner's specialty or subspecialty in this state for a period of at least two years from the issue date of the subsidy." N.J.A.C. 11:27-7.8(a); see also P.L. 2004, c. 17 ง 28(d)(1). A recipient of a subsidy cannot change or limit his or her specialty or subspecialty for two years, nor may he or she reduce his or her practice hours. Thus, plaintiffs' argument that a recipient need not practice in the same specialty or volume is adequately addressed by the regulations. The legislative history, as recounted above, also sheds light on the consideration furnished by the subsidy recipients. The very doctors most likely to fall into the eligible classes are those who practice in the specialties or subspecialties most affected by high premiums and who testified that, without premium assistance, they would have to stop practicing in those specialized areas or stop doing so in New Jersey. "`The essential requirement of consideration is a bargained-for exchange of promises or performance that may consist of an act, a forbearance, or the creation, modification, or destruction of a legal relation.'" Campi v. Seven Haven Realty Co., 294 N.J.Super. 37, 43, 682 A.2d 281 (Law Div.1996) (quoting Fregara v. Jet Aviation Business Jets, 764 F.Supp. 940, 948 (D.N.J.1991)); Shebar v. Sanyo Business Systems Corp., 111 N.J. 276, 289, 544 A.2d 377, (1988) (citing Restatement (Second) of Contracts ง 71 (1981)). If those doctors accepted the subsidies, they would be obliged to continue practicing and to do so in New Jersey, which is valid consideration under contract principles.
Plaintiffs correctly point out that nothing mandates the doctors receiving subsidies to undertake the high risk procedures or specialized cases. This is not fatal to the Act's constitutionality because ample consideration is furnished by the doctors' agreement to continue practicing in New Jersey, in their specialty or subspecialty and at the same level as prior to receipt of the subsidy. Even if the Legislature were to require doctors to handle those cases, such may not be amenable to a mandate. Many considerations go into the decision of whether to perform such procedures, and the decision lies in the expertise of those highly specialized doctors.
DOBI has outlined and made publicly available the method used to make its assessment of whether access to care in certain specialties and subspecialties is so significantly threatened as to warrant eligibility for a subsidy.[11] A recipient need not commit to serving a specific geographic area; however, in certifying the class or classes for eligibility, whether access to care is threatened in a geographic area may be considered. N.J.A.C. 11:27-7.5(a). In addition, the criteria for eligibility may be waived if access to care in a geographic area is threatened because of an inability *550 of a sufficient number of practitioners in that specialty or subspecialty to practice there. N.J.A.C. 11:27-7.5(c).
Although there is no contract provision in the statute or regulations, the court acknowledges that the professionals eligible to receive the subsidy are members of a heavily regulated profession requiring licensure by the New Jersey State Board of Medical Examiners.[12] The regulations provide that "[i]n the event it is determined that the practitioner filed a certification which contained false or inaccurate information, the Department shall refer the matter to the appropriate Board for disciplinary action," and "any person who violates the provisions of this subchapter may be subject to the imposition of any other penalties as authorized by law." N.J.A.C. 11:27-7.8(b) and (d). In addition, the Commissioner is authorized by the Act to take all necessary action to recover the cost of a subsidy incorrectly provided, and a practitioner who fails to comply with the Act's requirements shall be required to repay the amount of the subsidy. P.L. 2004, c. 17 ง 28(a)(4) and (d)(2); N.J.A.C. 11:27-7.8(c). These provisions satisfy the need to protect the public's interest in ensuring that the funds are used for the public purpose.
The loan reimbursement allocation will be implemented through a program established within the Higher Education Student Assistance Authority. Recipients must agree, by contract, to "practice as an obstetrician/gynecologist in an underserved area in this State for a period of at least four years after receipt of the payment." P.L. 2004, c. 17 ง 29(b)(1) and (c). The criteria for designating underserved areas are established in N.J.S.A. 18A:71C-35. The agreement is clearly delineated and circumscribed by legislation. Further, the recipients' agreement not only to practice in New Jersey, but to practice in an underserved area constitutes sufficient consideration for the loan reimbursements.

2. Paramount Factor
The second prong requires that accomplishing the public purpose of the statute by the recipient of the financial assistance it provides is the paramount factor and that any private advantage is incidental and subordinate. With a sufficiently clear and detailed statute, a contract meeting the specifications of the statute "would have for its primary objective" the public purpose and "would be so closely allied with the effectuation of such purpose that the private benefit radiating therefrom would be subordinate and incidental." Roe, supra, 42 N.J. at 219, 199 A.2d 834. "[T]he circumstance that some private benefit may be derived from the... public money as an incident of its use in the execution of a paramount public purpose will not bring the statutory authorization for the financial assistance within the constitutional ban." Id. at 218, 199 A.2d 834.
The paramount purpose here is to continue the public's access to high-quality health care, and the means used are ameliorating the rising cost of medical malpractice liability insurance premiums and providing student loan reimbursement. It is acknowledged that individual doctors receive a benefit, but such benefit is subordinate to, although necessary to accomplishing, the paramount goal. In short, patients cannot be treated without practicing doctors to do so. A recipient of a *551 premium subsidy or loan reimbursement, by practicing his or her profession, would effectuate the purpose of providing health care, and by accepting the subsidy or reimbursement, he or she would be obligated to do so in New Jersey. Therefore, the subsidy or reimbursement is so closely allied with achieving the public purpose of ensuring access to health care in New Jersey that the private benefit to the recipients is subordinate and incidental.
Further, the means of accomplishing the purpose of the Act are a matter of legislative policy, and as such, as noted in the equal protection analysis (See supra Part IV.E, p. 316-17, 888 A.2d p. 545-46), they are not readily second-guessed by the judiciary.

VI. Special Legislation
"The New Jersey Constitution requires the Legislature to pass `general laws' on most matters, and it specifically prohibits the Legislature from passing any `private, special or local laws' on a number of subjects." Camden City Bd. of Educ. v. McGreevey, 369 N.J.Super. 592, 604, 850 A.2d 505 (App.Div.2004). N.J. Const. art. IV, ง 7 ถ 9, provides, in relevant part,
The Legislature shall not pass any private, special or local laws: ...
(6) Relating to taxation or exemption therefrom ...
(8) Granting to any corporation, association or individual any exclusive privilege, immunity or franchise whatever ... The Legislature shall pass general laws providing for the cases enumerated in this paragraph, and for all other cases which, in its judgment, may be provided for by general laws....
The purpose behind the prohibition on special legislation rests on the notion that "`[o]ver the course of time, ... the propensities of legislatures to indulge in favoritism through special legislation developed into a major abuse of governmental power.... [C]onstitutional prohibitions were enacted to limit the practice of enacting special legislation and to achieve greater universality and uniformity in the operation of statute law in respect to all persons.'" Vreeland v. Byrne, 72 N.J. 292, 298, 370 A.2d 825 (1977) (quoting 2 Sutherland, Statutory Construction (4th ed. 1973) ง 40.01).
"From a constitutional standpoint, a law is regarded as special legislation `when by force of an inherent limitation, it arbitrarily separates some persons, places or things from others upon which, but for such limitation, it would operate. The test of the special law is the appropriateness of its provisions to the objects that it excludes.'" Town of Secaucus v. Hudson County Bd. of Taxation, 133 N.J. 482, 494, 628 A.2d 288 (1993), cert. denied sub nom City of Bayonne v. Town of Secaucus, 510 U.S. 1110, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994) (quoting State ex rel. Budd v. Hancock, 66 N.J.L. 133, 135, 48 A. 1023 (Sup. Ct.1901)). "In other words, it is not who the classification includes, but whether it excludes some who should be included." N.J. State Firemen's Mut. Benevolent Ass'n v. N. Hudson Reg'l Fire and Rescue, 340 N.J.Super. 577, 588, 775 A.2d 43 (App. Div.), certif. denied, 170 N.J. 88, 784 A.2d 721 (2001) (quoting City of Jersey City v. Farmer, 329 N.J.Super. 27, 38, 746 A.2d 1018 (App.Div.), certif. denied, 165 N.J. 135, 754 A.2d 1211 (2000)). A question of special legislation will turn on "the classifiability, for purposes of legislation, of the object of the ... law [at issue]. This is a question of fact." Budd v. Hancock, supra, 66 N.J.L. at 136, 48 A. 1023.
The three-part test a statute must meet to uphold the presumption of constitutionality was set forth in Vreeland v. Byrne, supra, 72 N.J. at 300-301, 370 A.2d *552 825. First, the court must "determine the purpose of the enactment and the subject matter with which it is concerned." Id. at 298, 370 A.2d 825 (citations omitted). The purpose of the enactment "having been determined, it is next appropriate to inquire whether there are persons similarly situated to those embraced within the act, who, by the terms of the act, are excluded from its operation." Id. at 299, 370 A.2d 825. Third, the court must determine "whether the classification is reasonable, not arbitrary, and can be said to rest upon some rational basis justifying the distinction." Ibid. (citing Budd, supra, 66 N.J.L. at 135, 48 A. 1023; Woodruff v. Freeholders of Passaic, 42 N.J.L. 533, 535 (Sup.Ct.1880). Cf. Skinner v. Collector, 42 N.J.L. 407, 412 (Sup.Ct.1880)). See also Town of Secaucus, supra, 133 N.J. at 494, 628 A.2d 288; Camden, supra, 369 N.J.Super. at 605, 850 A.2d 505;.
The party challenging a statute as special-legislation in violation of N.J. Const. art. IV, ง 9 ถ 9 bears the burden of demonstrating clearly its unconstitutionality. Town of Secaucus, supra, 133 N.J. at 493, 628 A.2d 288. "A statute must `clearly and irremediably violate[]' the ban on special legislation to be invalidated." City of Jersey City, supra, 329 N.J.Super. at 38, 746 A.2d 1018 (citing Town of Secaucus, supra, 133 N.J. at 493, 628 A.2d 288).
The test for distinguishing a special law from a general law is similar to the analysis used for equal protection. "The similarity of special legislation analysis to equal protection analysis means that `the Legislature has wide discretion in determining the perimeters of a classification.'" Camden City Bd. of Educ., supra, 369 N.J.Super. at 605, 850 A.2d 505 (quoting Paul Kimball Hospital Inc. v. Brick Township Hospital, 86 N.J. 429, 446, 432 A.2d 36 (1981)). See also McKenney v. Byrne, 82 N.J. 304, 314, 412 A.2d 1041 (1980); City of Jersey City, supra, 329 N.J.Super. at 38, 746 A.2d 1018;. "The question boils down to whether the court can perceive of any rational basis for the legislative classification whose impact, whether positive or negative, falls on a single person or entity." City of Jersey City, supra, 329 N.J.Super. at 39, 746 A.2d 1018. Moreover, "the analysis already engaged in by [the court] in the context of equal protection is generally dispositive of plaintiffs' arguments with regard to their contention that [the law] is a special law." Blair v. Erie Lackawanna, 124 N.J.Super. 162, 180, 305 A.2d 446 (Law Div.1973).
With this in mind, the discussion here will be brief because, as the complete equal protection analysis (See supra Part IV) makes clear, the purpose of the statute is to ensure high quality health care for the people of New Jersey, and the means to do so in the short term are rationally related to that goal. Nonetheless, plaintiffs challenge ง 27 as special because 1) attorneys do not belong in the class assessed; 2) certain attorneys who should be included in the class are excluded; and 3) others who should be in the class assessed are excluded.

A. Purpose and Subject Matter
The purpose of the Act is to ensure New Jersey residents' access to high quality health care, which, the Legislature concluded, was threatened by steep increases in the cost of medical malpractice liability insurance. The subject matter of the legislation includes the State's tort liability system, as it was cited among the causes of the insurance premium increases. P.L. 2004, c. 17 ง 2(d).

B. Persons Similarly Situated
Included in the classification of persons assessed to contribute to the fund are: all *553 employers who are subject to the New Jersey "unemployment compensation law," which contribution may, at the option of the employer, be treated as a payroll deduction to each covered employee (ถ 1); every physician and podiatrist licensed by the State Board of Medical Examiners (ถ 2), every chiropractor licensed by the State Board of Chiropractic Examiners (ถ 3); every dentist licensed by the State Board of Dentistry (ถ 4); every optometrist licensed by the State Board of Optometrists (ถ 5); and each person licensed to practice law in this State (ถ 6).
There are persons similarly situated to those embraced within the Act, who, by the terms of the Act, are excluded from its operation. The Act expressly excludes from the assessment those professionals identified in ถถ 2 through 6 who are statutorily or constitutionally barred from the practice of their respective profession or who can show that they do not maintain a bona fide office in the State; have completely retired from practice; have not practiced that profession for more than one year, among other reasons. P.L. 2004, c. 17 ง 27(b)(1)-(6). Excluded from the assessment, of course, is any person or group not specifically included, such as any employer not subject to the unemployment compensation law as well as others employed in the health care field such as nurses and technicians.
Plaintiffs argue that the classification should include, because they are similarly situated, "persons who are employed by, or who have direct contact with health care providers, or insurance carriers ... including nurses, hospital administrators, operating room technicians, pharmaceutical and medical equipment supply companies and manufacturers, those who testify as expert witnesses, accountants, psychologists and pharmacists ..." (Pl.'s Br. In Supp. Mot. Summ. J. at 53). As noted above, the burden is on plaintiffs to demonstrate clearly the unconstitutionality of this provision. Other than the conclusory statement that these people "reasonably should be a part of the class targeted for assessment," plaintiffs take no further steps of meeting their burden by establishing how these people are similarly situated. It should first be noted that if they are employers, as are some listed by plaintiffs, they are included in the Act. Furthermore, if their employer so chooses, these people may be contributing because the $3 assessment is taken as a payroll deduction. Outside of their possible contribution under ง 27(b) ถ 1, even accepting that a group has a relationship to health care, plaintiffs have not established that they are similarly situated to the professionals identified in ถถ 2 through 6, who generally are required to have an advanced or specialized degree to practice. However, because, as noted in the equal protection analysis above and as will be discussed briefly below, this court finds a rational basis for the current classification the legislation does not violate the constitutional prohibition on special legislation.

C. Classification Resting on a Rational Basis
Turning to the third part of the Vreeland test, it should be noted that, "[t]here is no general rule to distinguish a reasonable from an unreasonable classification, the question being a practical one varying with the facts in each case.... The burden of showing that the classification is not reasonable is upon the party attacking the statute. If we can conceive of any reason to justify the classification, the statute is upheld." Newark Superior Officers Ass'n v. City of Newark, supra, 98 N.J. at 227, 486 A.2d 305.
As discussed above (See supra Part IV.E, pp. 309-18, 888 A.2d pp. 541-46), the *554 classification in the Act which includes attorneys with respect to the $75 assessment is rationally justified by the legislative findings. Hence, the classification is not constitutionally defective for underinclusiveness or overinclusiveness.

VII. Separation of Powers
"The constitutional spirit inherent in the separation of governmental powers[13] contemplates that each branch of government will exercise fully its own powers without transgressing upon powers rightfully belonging to a cognate branch." Knight v. City of Margate, 86 N.J. 374, 388, 431 A.2d 833 (1981). It "denotes not only the independence but also interdependence among the branches of government" and "contemplates that the several branches will cooperate to the end that government will succeed in its mission." Ibid.
N.J. Const. art. VI, ง 2, ถ 3 provides, "The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts." The settled construction of N.J. Const. art. VI, ง 2, ถ 3 holds that "the Supreme Court has exclusive and plenary power to promulgate rules governing practice and procedure in our courts, as distinguished from matters involving substantive law," which are the province of the Legislature. Siegler Co. v. Norton, 8 N.J. 374, 381, 86 A.2d 8 (1952) (citing Winberry v. Salisbury, 5 N.J. 240, 74 A.2d 406 (1950)). "[T]he rule-making power of the Supreme Court is not subject to overriding legislation, but ... it is confined to practice, procedure and administration as such." Winberry, supra, 5 N.J. at 267, 74 A.2d 406.
However, "it is simplistic to assume that all law is divided neatly between `substance' and `procedure.'" Busik v. Levine, 63 N.J. 351, 364, 307 A.2d 571 (1973). "Courts are often confronted with rules and acts having both substantive and procedural characteristics." Suchit v. Baxt, 176 N.J.Super. 407, 424, 423 A.2d 670 (Law Div.1980). "The line between `substance' and `procedure' shifts as the legal context changes. `Each implies different variables depending upon the particular problem for which it is used.'" Hanna v. Plumer, 380 U.S. 460, 471, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8, 17 (1965) (quoting Guaranty Trust Co. of New York v. York, 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079, 2086 (1945)).
Substantive law defines rights and duties; the law of procedure and practice provides the mechanism through which such rights and duties are enforced in the courts. Winberry, supra, 5 N.J. at 247-248, 74 A.2d 406; Hanna, supra, 380 U.S. at 464, 85 S.Ct. at 1140, 14 L.Ed.2d at 12-13. Another mechanism for making the distinction is the "sole outcome" test. "If the rule can determine in and of itself the outcome of the proceeding, it is generally substantive. If it is but one step in the ladder to final determination and can effectively aid a court function, it is procedural in nature and within the Supreme Court's power of rule promulgation." Suchit, supra, 176 N.J.Super. at 427, 423 A.2d 670.
Even with such guidance, making the substantive-procedural distinction is difficult. "Inevitably some osmosis occurs when the branches of government touch one another; the powers of one branch sometimes take on the hue and characteristics of the powers of the others." *555 Knight, supra, 86 N.J. at 388, 431 A.2d 833. "A rule of procedure may have an impact upon the substantive result and be no less a rule of procedure on that account." Busik, supra, 63 N.J. at 364, 307 A.2d 571.
The Supreme Court has the authority to permit or accommodate a legislative action that might impinge upon the Court's constitutional concerns in the judicial area depending on the nature and extent of the encroachment. Knight, supra, 86 N.J. at 390-391, 431 A.2d 833. Where a statute's provisions are "fair and reasonable, and serve a legitimate governmental purpose ... the Supreme Court does not insist on exercising its constitutional authority to the exclusion of the Legislature." State v. Roberson, 246 N.J. Super. 597, 605, 588 A.2d 434 (App.Div. 1991). "Resolution of this question calls not for a jealous or begrudging evaluation by the Court of comparative judicial and legislative interests, but a realistic and fraternal appreciation of the profound concern of the Legislature, an equal branch of government...." Knight, supra, 86 N.J. at 393, 431 A.2d 833.
While a rule and statute may address related matters, the rule and statute may not be incompatible. The "absence of any expression of preemptive intent in the rules adopted by" the Supreme Court governing the subject matter of the statute "as well as the long-established policy of judicial acceptance of statutory arrangements touching upon [the Supreme] Court's constitutional prerogatives" does not require holding the legislation unconstitutional. Id. at 394, 431 A.2d 833. For a lower court, the question involves some speculation as to the Supreme Court's reaction. Roberson, supra, 246 N.J.Super. at 605, 588 A.2d 434 (where a statute dealing with pretrial mechanism for rendering certain evidence admissible "does not interfere with judicial prerogatives of the Supreme Court" there is no foreseeable reason that the statute would be declared unconstitutional even though it is procedural).
The Supreme Court has repeatedly taken a cooperative approach when faced with such questions. See, e.g., Mt. Hope Development Associates v. Mt. Hope Waterpower Project, L.P., 154 N.J. 141, 712 A.2d 180 (1998) (the Alternate Procedure for Dispute Resolution Act, providing for no review of the arbitration award once confirmed and entered by the court, does not conflict with the Court's rule-making authority even in the face of R. 2:2-3, which grants the right to appeal from a final judgment); Borough of New Shrewsbury v. Block 115, Lot 4 Assessed to Hathaway, 74 N.J.Super. 1, 180 A.2d 387 (App.Div. 1962) (a motion to reopen a judgment is a matter of practice and procedure subject to the court's prevailing rule-making power, but in areas of special legislative concern, a statute and rule should be read together); Fagas v. Scott, 251 N.J.Super. 169, 209, 597 A.2d 571 (Law Div.1991) (even though awarding counsel fees is a matter of procedure addressed in an existing court rule, a frivolous litigation statute providing for counsel fees does not run afoul of the Court's rule-making authority, and the rule and statute can be read together).
However, "where a statute, wholly procedural in its operation, is in conflict, either directly or by necessary implication, with a rule of procedure promulgated by [the Supreme Court], pursuant to the authority delegated to it under the Constitution," the statute is superseded and no longer is effective. See Siegler, supra, 8 N.J. at 382-383, 86 A.2d 8 (statute requiring the contributory negligence issue to be submitted to a jury superseded by rules permitting entry of judgment of dismissal *556 at the close of the plaintiff's case or entry of judgment at the close of all the evidence).

A. Complimentary Dispute Resolution
The Act allows a judge presiding over a medical malpractice action to refer the matter to complementary dispute resolution ("CDR") pursuant to R. 1:40 if the judge determines that it might encourage early disposition or settlement of the action. P.L. 2004, c. 17, ง 5. Plaintiffs argue that the Legislature overstepped its constitutional boundaries by addressing complementary dispute resolution, a plainly procedural matter.
Under the "sole outcome" test identified in Suchit, supra, CDR is a procedural matter, as directing parties to engage in an alternative method of resolution will not determine, in and of itself, the outcome of the proceeding. CDR "programs... constitute an integral part of the judicial process, intended to enhance its quality and efficacy." R. 1:40-1. CDR is an alternative means to final disposition of a matter, and can effectively aid the court in resolving cases. See, e.g., State v. Leonardis, 73 N.J. 360, 375 A.2d 607 (1977) (the pretrial intervention program, adopted pursuant to court rule, was a procedural alternative to the traditional system of prosecution and was aimed at efficiently and inexpensively disposing of cases). Under the procedural-substantive distinction outlined in Winberry, supra, CDR does not define a right or duty; rather, it provides a means for enforcing such rights and duties. Thus, CDR is a procedural matter and falls within the Supreme Court's rule-making authority under N.J. Const. art. VI, ง 2, ถ 3.
The Act serves a significant governmental purpose: reforming the State's tort liability system in a way that will "ensure that high-quality health care continues to be available in this State and that the residents of this State continue to have access to a full spectrum of health care providers ..." P.L. 2004, c. 17, ง 2. The Judiciary's rule, R. 1:40-1, which is referenced in ง 5 of the Act, is not in conflict with the statute. The statute merely directs the court to determine whether medical malpractice actions might benefit from CDR, and, if so, to refer the matter there. R. 1:40-4 provides that a judge may require the parties to attend a mediation session at any time following the filing of the complaint. Section 5 of the Act requires the judge to make the determination of whether to refer the matter within thirty days after the discovery end date; however, it also provides that the section shall not be construed to limit the authority of the judge to refer the action to CDR prior to the discovery end date. Thus, although the final determination lies in the discretion of the Supreme Court, the impingement on the Supreme Court's rulemaking authority does not require a declaration by this court that the statute is unconstitutional.

B. Affidavit of Noninvolvement
One of the tort system reforms in the Act allows a health care provider, who is named as a defendant in a medical malpractice action, to file an affidavit of noninvolvement with the court and have the claim against him or her dismissed. P.L. 2004, c. 17, ง 6. The claimant or a codefendant is permitted to challenge the affidavit of noninvolvement, and, if successful, the claimant or codefendant may have the claim reinstated against the health care provider. Plaintiffs challenge ง 6 as unconstitutional because the Legislature has attempted to create a summary disposition procedure akin to the existing summary judgment procedure provided in R. 4:46-1. *557 They assert that the Supreme Court's power over the means by which cases are decided on their merits has been usurped.
Both R. 4:46, summary judgment, and R. 4:6-2(e), dismissal for failure to state a claim upon which relief can be granted, provide the court and parties a mechanism to efficiently grant judgment to parties, where the law so provides based on the undisputed material facts, or to dismiss claims against parties for which the law provides no remedy under the facts alleged. Section 6 is similar. It provides for dismissal of claims against those who file an affidavit of noninvolvement.
Further, it is recognized that due to the entire controversy doctrine, R. 4:30A, a plaintiff will make every effort to include in his or her pleading anyone who may be liable for the damages he or she alleges. The legislative history contains discussion of physicians' complaints that they have been named in cases brought by plaintiffs they never treated. The entire controversy doctrine embodied in R. 4:30A falls among the joinder rules: R. 4:27-1, joinder of claims; R. 4:28-1, joinder of parties; and R. 4:29, joinder of multiple parties. The joinder rules address which parties could be or must be included in one action. The rules, which are "not only conceptually similar but are procedural twins," encompass "both fairness to parties and judicial efficiency and economy." Cogdell v. Hospital Center at Orange, 116 N.J. 7, 17, 560 A.2d 1169 (1989). Like the joinder rules, the affidavit of noninvolvement provision is procedural in that it provides a mechanism for removing a party who alleges that he or she should not be included in an action, and for recalling the party to the action if it is determined that he or she was properly included.
While the affidavit of noninvolvement determines the outcome as to a particular defendant, it is more akin to a rule of procedure. Under the "sole outcome" test identified in Suchit, supra, the affidavit of noninvolvement is a procedural matter because it does not determine, in and of itself, the outcome of the proceeding; rather, the affidavit of noninvolvement is merely "one step in the ladder to final determination." Use of the affidavit of noninvolvement determines which parties must remain in a proceeding and continue to resolution on the merits. The affidavit of noninvolvement, like the summary judgment, dismissal and joinder rules, can effectively aid the court in resolving cases by whittling down the parties in the case to those actually involved in the underlying medical treatment at issue. Under the procedural-substantive distinction outlined in Winberry, supra, the affidavit of noninvolvement does not define a right or duty; rather, it provides a means for removing parties who should not be a part of the claim or recalling parties who should. Thus, the affidavit of noninvolvement is a procedural matter and falls within the Supreme Court's rule-making authority under N.J. Const. art. VI, ง 2, ถ 3.
Plaintiffs argue that the rules governing summary judgment motion practice are particularly important in ensuring the effective administration of justice in the courts and that the statute invades the Supreme Court's rule-making authority by side-stepping the summary judgment procedure established by rule. Nothing in ง 6 precludes a party from using R. 4:46 or R. 4:6-2(e). The Supreme Court's procedures for summary disposition of a case remain in full effect. Under R. 4:46-2(b), the motion shall be served with briefs, a statement of material facts and with or without supporting affidavits. R. 4:6-2(e) limits the court's consideration to matters within the four corners of the pleadings. Section 6, which requires the party seeking dismissal from the case to file an affidavit, *558 imposes a requirement somewhere between the rules' requirements. While the statute imposes a different requirement from those of summary judgment or dismissal for failure to state a claim, the statute and rules are not in conflict because of this difference.
Plaintiffs note that ง 6 does not invite the Supreme Court to develop rules to implement the section. The constitutional grant of power states, "The Supreme Court shall make rules" governing practice and procedure in the courts. N.J. Const. art. VI, ง 2, ถ 3 (emphasis added). The Supreme Court need not wait for an invitation to adopt rules where needed, whether to implement a statute or otherwise. "The rule-making power of the Supreme Court ... is a duty that the justices of the Supreme Court must exercise as part of their constitutional obligations...." State v. Otis Elevator Co., et al., 12 N.J. 1, 14, 95 A.2d 715 (1953). "Rules of court ... have the great advantage that not only are they made by experts, but they are interpreted and applied by judges who are sympathetic to them. Changes may be made wherever occasion may require without waiting for stated legislative sessions and without burdening already overworked legislators." Winberry, supra, 5 N.J. at 254, 74 A.2d 406.
For example, when the Legislature enacted statutes providing for arbitration of certain automobile accident claims, it allowed each party involved in the arbitration thirty days in which to reject the award and petition the court for a trial de novo. The Supreme Court adopted R. 4:21A-1 et seq. to implement the statute. Although the Legislature intended the thirty-day rule to be strictly enforced, the Supreme Court found that the courts could relax the thirty-day limitation on requests for a trial de novo when extraordinary circumstances existed. Hartsfield v. Fantini, 149 N.J. 611, 615-618, 695 A.2d 259 (1997).
Plaintiffs note that ง 6 does not specify the timing for filing an affidavit of noninvolvement, nor does it prohibit the filing of an affidavit of noninvolvement before discovery is completed. Plaintiffs cite Salomon v. Eli Lilly & Co., 98 N.J. 58, 484 A.2d 320 (1984) and Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 536 A.2d 237 (1988), in which the Supreme Court found the cases in too early a stage without enough discovery having been completed to award summary judgment in favor of the defendants. While the cases cited indeed show that the court has discretion to deny a motion for summary judgment "to afford a litigant who has a bona fide cause of action or defense the opportunity for full exposure of his case," Velantzas, supra, 109 N.J. at 193, 536 A.2d 237, they do not suggest that granting summary judgment at an early stage is flatly prohibited.
It should be noted that the existing rule does not prohibit filing a motion for summary judgment before discovery is completed. Plaintiffs are citing case law, not a rule or a statute.
Section 6, therefore, does not, by failing to prohibit filing before discovery is complete, "usurp" the Supreme Court's rulemaking power. Section 6 provides no time restrictions at all. The implementation of the affidavit of noninvolvement similarly may be affected by case law. Alternatively, the Supreme Court could require, through implementing rules, that the affidavit not be filed until a certain point in the discovery process, or could afford the codefendants or claimants enough time to file their affidavit challenging the provider's assertion of noninvolvement so that they could continue to develop facts requiring the party's presence in the case.
*559 Finally, plaintiffs argue that the affidavit of noninvolvement procedure will burden parties with meritorious claims with an additional layer of motion practice or will cause meritorious claims to be dismissed. Given the ง 8 requirement that each professional be provided an affidavit of lack of care (See infra Part VII.C) within 60 days of the filing of the answer, it does not seem that a claimant or codefendant will face much difficulty in responding to an affidavit of noninvolvement.
In 1998, a separation of powers argument was raised against the Legislature's authority to require a plaintiff to submit an affidavit of merit as part of medical malpractice claims. Without dealing with the issue conclusively, the Supreme Court found the Legislature's decision to impose the requirement did not conflict with the Court's rules and would not interfere with the Judiciary's role in resolving medical malpractice disputes. Cornblatt, P.A. v. Barow, 153 N.J. 218, 248, 708 A.2d 401 (1998). Nothing suggests that the Supreme Court would find any differently here.
Further, the plaintiffs essentially are arguing that ง 6 of the statute is unwise. "As a general proposition, `[as to] the legitimacy and reasonableness of legislation, courts generally defer to legislative judgment.'" N.J. Ass'n of Health Plans, supra, 342 N.J.Super. at 565, 777 A.2d 385 (quoting In re PSE & G Company's Rate Unbundling, 330 N.J.Super. 65, 94, 748 A.2d 1161 (App.Div.2000)). "[The New Jersey Supreme] Court has ... stated, `We do not sit as a body reviewing the wisdom of legislative decisions .... If the statute does not violate the Constitution but is merely unwise or based on bad policy, then ... it is for the Legislature rather than this Court to deliver a finishing blow to it.'" Roman Check Cashing, Inc. v. NJ Dept. of Banking and Insurance, 169 N.J. 105, 111, 777 A.2d 1 (2001) (quoting Bd. of Educ. of Piscataway Tp., supra, 86 N.J. at 318, 431 A.2d 799 (citations omitted)). While ง 6 is procedural, it does not conflict with the Supreme Court's rules, and thus it is not an unconstitutional infringement on the Judiciary's power. Whether it is wise is not for this court to decide.

C. Qualifications of Experts and Those Providing an Affidavit of Lack of Care
In งง 7 and 8 of the Act, the Legislature imposes new requirements on those who provide expert testimony in medical malpractice actions and those who execute an affidavit of lack of care.[14] The plaintiffs argue that the requirements modify the Rules of Evidence regarding the qualifications needed to admit expert testimony. Plaintiffs argue that งง 7 and 8 affect not the substance of expert testimony, but the procedure by which it is admitted, and thus, invade the Supreme Court's rule-making power.

1. Affidavit of Lack of Care
Plaintiffs' challenge regarding ง 8, which amended N.J.S.A. 2A:53A-27, is based on the evidentiary requirement. They do not challenge the Legislature's *560 authority to require an affidavit of lack of care.[15]
Section 8 is implicated in the qualifications question only insofar as it adopts the requirements that ง 7 imposes on experts. Because ง 8 is limited to the affidavit of lack of care and does not address testimony or evidence, it does not implicate the rules of evidence. The Legislature acted within its sphere when it decided to require the affidavit, and the reference to ง 7 was merely an expedient way to specify the standards the Legislature chose to impose on the person providing the affidavit.
Concededly, the person providing the affidavit of lack of care may become the plaintiff's expert. The person's qualifications become an evidentiary issue, then, only with regard to that person's ง 7 role. Thus, the court need only address the constitutional challenge to ง 7.

2. Expert Testimony
Plaintiffs recognize that drawing a line between the Legislature's province and that of the Supreme Court is particularly difficult in the arena of the Rules of Evidence. The Supreme Court, itself, has wrestled with the question. See Busik, supra, 63 N.J. at 367, 307 A.2d 571.

a. Evidence Act of 1960
The responsibility for the enactment of rules of evidence was not mentioned in N.J. Const. art. VI, ง 2, ถ 3, nor was it resolved in Winberry v. Salisbury, supra. Rybeck v. Rybeck, 141 N.J.Super. 481, 510, 358 A.2d 828 (Law Div.1976). The New Jersey Rules of Evidence
were the product of a cooperative orchestrated effort by the three branches of government under the Evidence Act, 1960, N.J.S.A. 2A:84A-1 et seq. Under the arrangement, some rules were legislated. Others were adopted by the Supreme Court, subject to disapproval by other branches. The plain purpose was to avoid a constitutional confrontation on the matter and to find a practical course by which the administration of justice could best be served.
Ibid.
The Evidence Act also provided, in Article III, a mechanism for the future adoption of rules. That article's first provision, N.J.S.A. 2A:84A-33, states, "The Supreme Court may adopt rules dealing with the admission or rejection of evidence, in accordance with the procedures set forth in this article."
Pursuant to the Evidence Act of 1960, the procedure for adopting new or revised rules requires that a draft of the proposed rule be entered on the agenda and discussed at a Judicial Conference, N.J.S.A. 2A:84A-34, publicly announced by this Court on "September 15 next" following the Judicial Conference and concurrently delivered to the President of the Senate, Speaker of the General Assembly, and the Governor. N.J.S.A. 2A:84A-35. Unless cancelled by a joint resolution of the Senate and Assembly signed by *561 the Governor, the proposed rule becomes effective on July 1 next following the rule's announcement by the Court. N.J.S.A. 2A:84A-36. In addition, this Court may adopt or revise rules of evidence at any time, without presentation to the Judicial Conference, with the concurrence of the Senate and General Assembly reflected by a joint resolution adopted by those bodies and signed by the Governor. N.J.S.A 2A:84A-38.

[State v. D.R., 109 N.J. 348, 376, 537 A.2d 667 (1988).]
The authority to change or alter a rule of evidence is not vested solely in the Supreme Court. The Evidence Act states, "Any rule or rules so proposed or adopted shall be subject to change or cancellation at any time by statute or by subsequent rule adopted pursuant to this article." N.J.S.A. 2A:84A-37 (emphasis added).
The 1960 Evidence Act itself shows the Supreme Court's acquiescence to the Legislature's role in establishing rules of evidence in New Jersey. Rather than staking out the province of evidence as exclusively its own, the Supreme Court participated in this cooperative effort. In doing so, the Court retained power in two ways: the statutory mechanism under N.J.S.A. 2A:84A-33, and the Court's inherent power to declare any statute unconstitutional. Particularly telling is the fact that N.J.S.A. 2A:84A-37, which has been the law for more than forty years, has not been declared unconstitutional.
In fact, this statute was cited by the Supreme Court when discussing the doctrine of separation of powers and the delegation of power among branches. The Court emphasized that "there is no bar to cooperative action among the branches of government." Brown v. Heymann, 62 N.J. 1, 10-11, 297 A.2d 572 (1972). The Court continued, "Mention may also be made of N.J.S.A. 2A:84A-33 et seq., which provides that the State Supreme Court may adopt rules dealing with the admission or rejection of evidence, subject to disapproval by joint resolution of the Legislature signed by the Governor, N.J.S.A. 2A:84A-36." Id. at 11, 297 A.2d 572.
Plaintiffs argue that N.J.R.E. 702, which governs expert testimony, has been modified by the Act without following the procedures set forth in N.J.S.A. 2A:84A-33 et seq. Indeed, the statute will have an effect on N.J.R.E. 702 in the context of a medical malpractice action; however, under the plain language of N.J.S.A. 2A:84A-37, the Legislature has authority to change or cancel a rule adopted pursuant to the Evidence Act.

b. Statutory Rules of Evidence
The Legislature has enacted many rules of evidence.[16] New Jersey courts make *562 every attempt to read statutes, even those arguably dealing with rules of evidence, as not in conflict with rules established by the court. See, e.g., State v. Sands, 76 N.J. 127, 150, 386 A.2d 378 (1978) (statute mandating admission of evidence of any prior convictions for the purpose of affecting the credibility of any witness upheld with Supreme Court noting that it could adopt guidelines for the statute pursuant to the Evidence Act); Rybeck, supra, 141 N.J.Super. at 508, 358 A.2d 828 (provision of No Fault Act precluding admission of PIP benefits collectible or paid to an injured person construed to have a substantive purpose; such reading precluded the court from finding a conflict between the statute and existing rules of evidence while preserving the Supreme Court's authority to act in the event of a conflict with a rule); Roberson, supra, 246 N.J.Super. at 606, 588 A.2d 434 (although not adopted according to Rules of Evidence Act procedure, statute establishing pretrial procedure for rendering admissible the results of a chemical analysis of suspected controlled dangerous substances stands because determined to be a rule of procedure, not a rule of evidence).
Plaintiffs argue that ง 7 is procedural in nature as it does not determine the outcome of a medical malpractice action, but instead mandates requirements that are one step in the ladder to final determination. They argue that ง 7 modifies the manner in which experts are qualified, which, plaintiffs argue, is a process that has ordinarily been left to the judge.
The court in Suchit, supra, recognized that the procedural-substantive distinction shifts with the factual context. Whether an expert is qualified can determine the outcome of a case. If, on the day of trial, a proffered expert is not qualified in a case requiring expert testimony, it would be outcome determinative. In the factual context of a medical malpractice claim, where the standard of care is at issue, the application of ง 7 will play a significant role. While the issue comes close to the blurry line marking the procedural-substantive distinction, this court recalls the Paulison court's statement that a rule may have a substantive effect without being transformed into a rule of substance. Paulison Ave. Assoc. v. Passaic City, 18 N.J.Tax, 101, 112 (Tax1991). The qualifications of an expert do not embody a substantive right or duty; rather, under Winberry, supra, they relate to the mechanism for enforcing substantive rights and duties. The Supreme Court stated in dicta that "essential components" of its "constitutional obligation to make rules governing the practice and procedure in the courts" are "the trial process and the presentation of evidence." State In the Interest of W.C., 85 N.J. 218, 426 A.2d 50 (1981). However, for purposes of this motion, this court need not decide this dichotomy because even assuming that the rule is procedural, it does not conflict with an existing rule.
N.J.R.E. 702 refers only to "a witness qualified as an expert by knowledge, skill, experience, training or education." The requirement is also embodied in the case law. See State v. Odom, 116 N.J. 65, 71, 560 A.2d 1198 (1989) ("The witness offered as an expert must, of course, be substantially qualified and possessed of sufficient specialized knowledge to be able to express such an opinion and to explain the basis of that opinion"). While the requirements set out in ง 7 are more specific than those stated by N.J.R.E. 702, it cannot be said that the requirements are in conflict with an existing rule.
*563 Expert testimony is governed by a patchwork of the rules and case law. See, e.g., Ryan v. KDI Sylvan Pools, 121 N.J. 276, 579 A.2d 1241 (1990) (reliability requirement for expert testimony derives from the common law of evidence; technique used must be accepted by the scientific community); State v. Kelly, 97 N.J. 178, 478 A.2d 364 (1984) State v. Cavallo, 88 N.J. 508, 443 A.2d 1020 (1982). The requirements of ง 7 effectively raise admissible expert testimony in medical malpractice cases above a minimum floor provided by N.J.R.E. 702 and the case law. Section 7 modifies the application of N.J.R.E. 702 in medical malpractice cases and will have an impact on who may serve as an expert; however, it does not conflict with the existing rule.
Section 7 of the Act, which imposes additional requirements on those who provide expert testimony in medical malpractice actions, is both evidentiary and procedural in nature. The Legislature has enacted many statutes governing admissibility of evidence, which have been upheld out of respect for New Jersey's cooperative approach in the area of Rules of Evidence. In addition although procedural, ง 7 does not conflict with an existing court rule; thus any intrusion into the Supreme Court's rule-making authority does not render the Act invalid. The requirement that plaintiffs submit an affidavit of lack of care, under ง 8, will not interfere with the Judiciary's role in resolving medical malpractice disputes. Thus, the Act does not violate the doctrine of separation of powers or unconstitutionally impinge on the Supreme Court's authority.

VIII. Conclusion
For the reasons set forth herein, summary judgment is granted in favor of defendants.
NOTES
[1] Testimony concerning issues and recommendations relating to health-care quality issues, the enhancement of patient safety, and medical error reduction; Joint Hearing of the Assembly Health and Human Services and Banking and Insurance Committees; 210th Leg. Sess. (NJ August 2002) [hereinafter August 2002 Hearing] (comments of Assemblywoman Weinberg).
[2] Id. (comments of Assemblyman Cohen)
[3] Id. (comments of Assemblyman Conway)
[4] Elizabeth Ryan, General Counsel to the New Jersey Hospital Association testified at the June 3, 2002 and May 1, 2003 hearings, and Margaret Davino, Esq., Vice President and General Counsel to St. Joseph's Hospital and Medical Center testified at the June 3, 2002 hearing.
[5] Dennis Donnelly, Esq. testified at the June 3, 2002, August 1, 2002, and May 1, 2003, hearings, and Ronald Goldfaden, Esq. testified at the May 1, 2003 hearing.
[6] Bruce Stern, Esq., President of the Association of Trial Lawyers of America โ New Jersey testified at the August 1, 2002 and May 1, 2003 hearings; Edwin McCreedy, Esq., then First Vice President of the New Jersey State Bar Association, testified at the May 1, 2003 hearing; and Lee S. Goldsmith, M.D., Esq., Abbot S. Brown, Esq. and Michael S. Berger, Esq. testified on behalf of the Association of Trial Lawyers of America โ New Jersey at the June 3, 2002 hearing.
[7] Daniel Phillips, Esq. and Kevin Wolfe, Esq. testified at the May 1, 2003 hearing.
[8] Mr. Bruce Stern, President of the New Jersey chapter of American Trial Lawyers Association, gave almost eight pages of testimony stating that, "a subsidy plan is a far superior way to address the cyclical problem [of increasing medical malpractice premiums], which is driven by economic considerations outside the control of State government. More importantly, this approach does not harm victims, as it strives to help doctors." May 2003 Hearing (testimony of Bruce Stern, Esq.).

Mr. Stern went on to denounce the bill that was passed by the Senate because that bill included a cap on non-economic damage awards. Mr. Stern stated, "there are many unknown and unanswerable questions surrounding the creation of a cap gap cap fund that not only limits the liability of the physician who has committed an act of malpractice, but also limits the financial recovery of the injured patient. How much money will the fund need to cover ... Will lawyers be needed to defend the fund? ... If the fund only applies to jury verdicts, how will any cases ever be settled? ... Stop the injuries and you will stop the lawsuits ... For the past year ... the Medical Society has continually misrepresented the facts, and threatened and extorted this body to destroy the civil justice system here in New Jersey." Ibid. Mr. Stern spoke strongly in favor of subsidies and actually chastised the Medical Society for its resistance to the proposal: "Recently, before the Senate Health Committee, Paul Anzano, counsel to ProMutual Insurance Company, one of New Jersey's medical malpractice insurance companies, testified and recognized that the medical malpractice insurance problem was a cyclical and short term one, requiring a short term solution. So why then is the Medical Society against legislation which would subsidize its members?" Ibid. Finally, Mr. Stern informed the committee members of ATLA's position on this issue: "We support the plan to provide immediate, meaningful financial support to the physicians who are experiencing cost increases in their malpractice premiums that endanger their ability to maintain a medical practice. We applaud the efforts of Speaker Sires and Majority Leader Roberts to balance the interests of the parties involved in this debate. More importantly, we applaud their stand on behalf of the injured patients of New Jersey." Ibid.
The NJSBA also testified as to its interest in the "critical issue" of medical malpractice reform. May 2003 Hearing (testimony of Edwin McCreedy Esq.). In fact, the NJSBA deemed the issue so critical that the Association formed a task force that "brings together knowledgeable members of the Bar, who represent clients on all sides of the issue โ doctors, hospitals, the insurance industry, and injured patients โ because we represent all lawyers." Id. (emphasis added). Mr. McCreedy stated that "we have kept our members abreast of the latest medical malpractice developments through our newspaper, the New Jersey Lawyer, and communicated with State print and broadcast media, and met with members of the State Legislature, the Office of the Governor, the Commissioner of Banking and Insurance, and other affected interest groups." Id.
[9] Despite the plaintiffs' involvement in the passage of the Act, plaintiffs maintain their position that they have no interest in this issue and therefore should bear none of the expense, just as the hairdressers and dry cleaners do not have to bear any of the expense (other than as employers). Just to take one of plaintiffs' comparisons, the dry cleaning industry, the court searched the Internet for organizations that represent the dry cleaning industry to see if there was any reason why the Legislature had not noticed any rational relationship between dry cleaners and the healthcare system.

According to the Textile and Fabricare Industry's website, the main issues of importance to dry cleaners are "Home Dry Cleaning Kits: What they can and cannot do; Home Dry Cleaning Kits versus Professional Dry Cleaning; Alternative Technologies; Gender Pricing Issues; Care Labeling and Environmental and Health Issues." International Fabricare Institute, Fabricare Industry Issues, at http://www.ifi. org/industry/ fabricare-issues/ industryissues.html (n.d.). Under "Environmental and Health Issues", the only issue listed is the use of Perc, a dry cleaning solvent that is considered moderately toxic and requires careful handling. International Fabricare Institute, Environmental and Health Issues, at http://www.ifi. org/industry/ fabricare-issues/ environmental.html (n.d.). According to the World Educational Congress for Laundering and Dry Cleaning, the issues of concern to the dry cleaning industry right now are "Pricing Your Dryers for Profit"; What's Your Laundry Worth; Fashion-Forward Thinking: Rising to the Challenges of Clothing Trends; Marketing Designed to Fit Your Plant's Size; Marketing to Today's Laundry Customer and OSHA: Laundry Safety. World Educational Congress for Laundering and Dry Cleaning, at http://www.clean-show.com/ (n.d.).
The court takes judicial notice of these websites and finds that nowhere on any of the sites was medical malpractice or the future of the healthcare industry mentioned. In contrast, the American Bar Association's website lists three conferences that will be held later this year: the Physician-Legal Issues Conference on June 17, 2005; the Washington Healthcare Summit focusing on federal and state initiatives of critical importance to the healthcare industry and the 7th Annual Conference on Emerging Issues in Healthcare Law. American Bar Association, Health Law, at http://www.abanet. org/health/02_ programs/01_emerging_issues.html (n.d.).
The New Jersey State Bar Association is just as involved in the healthcare business as its national counterpart. The NJSBA's website has a link on the homepage that takes members to a long list of actions taken by the NJSBA on this issue including a Resolution of the NJSBA Board of Trustees on medical malpractice insurance reform; numerous letters to the Governor, letters to the editor and press releases dating back to 2002 from former NJSBA Presidents, Richard Badolato, Esq., Carol Korbin Walker, Esq. and Edwin McCreedy, Esq. New Jersey State Bar Association, Chronological History of NJSBA Action on Medical Malpractice Insurance Reform, at http://www.njsba. com/news/medmal/ index.cfm?fuseaction =medmalmain (n.d.). In addition, the New Jersey Institute for Continuing Legal Education (ICLE) is currently advertising its sales of the following publications: Managed Care Liability: A Guide to Litigating Claims Involving HMOs and Other Managed Care Entities; Everything You Should Know About HIPAA; Healthcare Transactions 2005; and Representing Physicians in Transactions Involving Medical Practices. New Jersey Institute For Continuing Legal Education, Practice Manuals, Handbooks and Audio Packages, at http://www.njicle. com/cgi-bin/njicle? SessionID=28&doc=/ Catalog/books/book_healthcare.htm (n.d.). On July 13, 2005, ICLE is hosting its Eighth Annual Elder and Disability Law Symposium at the NJ Law Center, and on August 10, 2005, ICLE is hosting a panel discussion on Medicaid Planning for Estate Planning Lawyers moderated by none other than the named plaintiff in this case, Ms. Peggy Sheehan Knee. Institute for Continuing Legal Education, Seminars, at http://www.njicle. com/cgi-bin/njicle? SessionID=28&doc=/ schedule.htm#july (n.d.).
Furthermore, it appears that the Bar's interest in the medical malpractice issue will continue with the NJSBA's newly elected President, Stuart Hoberman. Mr. Hoberman's "Back to Business" theme includes "continuing to oppose medical malpractice recovery caps and tort reform." Lisa Brennan, He's All Business, New Jersey Law Journal, May 16, 2005, at 4. An article titled "On Point" on the front page of the New Jersey Lawyer reads, "Doctors won't be happy, medical malpractice insurers will surely cringe and tort reformers will have to swallow hard, but the agenda for action being offered by the new president of the state's largest lawyer organization is tantamount to a home run for most of New Jersey's attorneys." Harvey C. Fisher, On Point, New Jersey Lawyer, May 23, 2005, at 1 (emphasis added). The article, citing Mr. Hoberman's speech at the annual NJSBA convention earlier this year, continues: "The veteran lawyer ... cut loose on insurance carriers for essentially fermenting what he branded a phony medical malpractice crisis that has pitted doctors against lawyers. But taking a shot at insurers wasn't the only marching music he offered the crowd, many of whom in recent years have witnessed increased curbs in tort actions or attorneys saddled with cumbersome court procedures that may be hampering the litigation process. Hoberman said the State Bar is prepared to go to the mat against so-called tort reform and the organization will not relent in its effort to convince the New Jersey Supreme Court that some of its best practices need revamping. His message to doctors who have been demanding caps on medical malpractice suits was succinct: No way." Id. at 29 (emphasis added).
[10] It should be noted that an application for the subsidy will not be accepted if the applicant has failed to pay the $75 annual assessment required by the Act.
[11] DOBI's Public Notice regarding the Medical Malpractice Liability Insurance Premium Assistance Fund โ Premium Subsidy, notes that "conferring eligibility upon any classes of practitioners other than those in specialties where access to care is most seriously threatened would minimize or eliminate the effect of the subsidy" and "would be contrary to the intent of the Legislature." Department of Banking and Insurance, Division of Insurance, Public Notice, at http://www.state.nj. us/dobi/acrobat/ph 050203.pdf. (n.d.).
[12] Both the legislation and regulations indicate coordination between DOBI and the New Jersey State Board of Medical Examiners. See N.J.A.C. 11:27-7.2, 7.3(a) and (g), 7.5(g), 7.6(a)(3) (applicant must submit type of licensure and license number), 7.8(b); P.L. 2004, c. 17 ง 28(c) and (f).
[13] "The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution." N.J. Const. art. III, ถ 1.
[14] Section 8 amended N.J.S.A. 2A:53A-27, which formerly required an affidavit of merit. The statute now requires that a "plaintiff shall, within 60 days provide each defendant with an affidavit that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices."
[15] The Supreme Court addressed the affidavit of merit, previously required under N.J.S.A. 2A:53A-27, in Cornblatt v. Barow, supra. The Supreme Court noted that it did not deal conclusively with the separation of powers question, as it had not been raised below. Nonetheless, the Cornblatt Court stated, "the Legislature's choice to require the affidavit of merit is in no way incompatible with this Court's rules regarding malpractice suits and will not interfere with the judiciary's role in resolving such disputes." Id. at 248, 708 A.2d 401. Similarly, although the requirement in ง 8 that a plaintiff submit an affidavit of lack of care is a more rigorous requirement than the former statutory requirement of an affidavit of merit, it is not incompatible with the Court's rules relating to malpractice suits and will not interfere with the Judiciary's role in resolving such disputes.
[16] See, e.g., State v. Gadsden, 245 N.J.Super. 93, 96, 584 A.2d 265 (App.Div.1990) (The Legislature, under N.J.S.A. 2C:35-7 provided that certain maps depicting the location and boundaries of the area on or within 1,000 feet of a school "shall, upon proper authentication, be admissible and shall constitute prima facie evidence of the location and boundaries of those areas." "The amendment is an evidentiary rule that permits the State to present authenticated written evidence of a fact in lieu of live testimony."); State v. Garron, 177 N.J. 147, 827 A.2d 243 (2003) (New Jersey's Rape Shield Law precludes the introduction of evidence of a victim's past sexual conduct to cast the victim as promiscuous or of low moral character); Pitti v. Astegher, 133 N.J. Super. 145, 335 A.2d 598 (Law Div. 1975) and Rybeck, supra (under the No Fault Act, evidence of the amounts collectible or paid pursuant to PIP benefits to an injured person is inadmissible in a civil action for recovery of damages for bodily injury by such injured person.); State v. Szemple, 135 N.J. 406, 640 A.2d 817 (1994) and In re Gail D., 217 N.J.Super. 226, 525 A.2d 337 (App.Div.1987) (psychologist-patient privilege, physician-patient privilege, marital communications privilege).